

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| CPK | *610 Federal Plaza* |
| F. #2016R01831 | *Central Islip, New York 11722* |

May 21, 2020

<u>By Hand and ECF</u>
Honorable Joan M. Azrack
United States District Judge
United States Courthouse
920 Federal Plaza
Central Islip, New York 11722

       Re:    United States v. Khwaja, et al.
              <u>Criminal Docket No. 18-607 (JMA)</u>

Dear Judge Azrack:

       Enclosed are the government's answering papers in response to the Omnibus Motions of the six defendants. Please note that we have divided the exhibits into three binders, (i) the five affidavits with their respective exhibits, (ii) all exhibits to the Memorandum including the first half of the Wiretap exhibit and (iii) the remainder of the wiretap exhibit.

       Please also note that the two Affidavits from Florida agents are not notarized due to the COVID-19 situation in Florida. If the court would like these two affidavits notarized once the situation in Florida permits, the government will do so. Thank you.

                   Respectfully submitted,

                   RICHARD P. DONOGHUE
                   United States Attorney

          By:    <u>/s/ *Charles P. Kelly*     </u>
               Charles P. Kelly
               Catherine M. Mirabile
               Burton T. Ryan, Jr.
               Assistant U.S. Attorneys
               (631) 715-7866

cc:    Defense Counsel (via ECF)

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

Docket No. 18-607 (JMA)

UNITED STATES OF AMERICA,

-against-

ENAYATULLAH KHWAJA,
also known as "Nat,"
ABDULRAHMAN KHWAJA,
RANA RAHIMI,
SHIKEBA RHAMATZADA,
ROBERTO SAENZ,
MAYNOR MELENDEZ-MENDOZA,
and NASEEM BOKHARI,
also known as "Sammy,"

Defendants.

GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

CHARLES P. KELLY
CATHERINE M. MIRABILE
BURTON T. RYAN, JR.
Assistant United States Attorneys
      (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendants Enayatullah Khwaja, also known as "Nat," ("E. Khwaja"), Abdulrahman Khwaja ("A. Khwaja"), Rana Rahimi ("Rahimi"), Shikeba Rhamatzada ("Rhamatzada"), Roberto Saenz ("Saenz") and Naseem Bokhari, also known as "Sammy," ("Bokhari") (collectively, the "moving defendants").[1]

The moving defendants, together with defendant Maynor Melendez-Mendoza ("Melendez-Mendoza"), who has since pled guilty, were charged in a 22-page indictment outlining the charges against them ("Indictment" or "Ind."). Specifically, between October 2013 and November 2018, the defendants engaged in a large-scale international trade-based money laundering scheme. For their conduct, all defendants were charged with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1), 1956(a)(2), 1956(a)(3) and 1957 (Count One). Defendants E. Khwaja, Melendez-Mendoza and Bokhari were charged with (i) the operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Count Two), (ii) causing the failure to file currency transaction reports ("CTRs"), in violation of 31 U.S.C. §§ 5324(a)(1), 5324(d)(1), and 5324(d)(2) (Count Three),

---

[1] The following abbreviations are used herein: (i) "Joint Def. Mem." for the Memorandum of Law in Support of A. Khwaja and Rhamatzada's Joint Omnibus Pretrial Motion and the Declaration of Michael Tremonte, dated March 6, 2020, respectively; (ii) "Rahimi Mem." for the Memorandum of Law in Support of Rahimi's Omnibus Pretrial Motions, dated March 6, 2020; (iii) "E. Khwaja Mem." for the Memorandum of Law in Support of E. Khwaja's Pretrial Motions; (iv) "Bokhari Motion" and "Bokhari Aff.," respectively for the Notice of Motion and Affirmation on behalf of defendant Bokhari, dated March 10, 2020; and (v) "Saenz Mem." for the Memorandum of Law in Support of Saenz's Pretrial Motions, dated April 20, 2020 and "Saenz Aff." for the Affidavit of Roberto Saenz dated April 13, 2020.

and (iii) causing the failure to file IRS 8300 reports, in violation of 31 U.S.C. §§ 5324(b)(1), 5324(d)(1), and 5324(d)(2) (Count Four).  In addition, all defendants, except for defendant Saenz, were charged with structuring financial transactions, in violation of 31 U.S.C. §§ 5324(a)(3), 5324(d)(1), and 5324(d)(2) (Count Five); and all defendants were charged with interstate and foreign travel and transportation in aid of a racketeering enterprise, in violation of 18 U.S.C. §§  1952(a)(1)(A), and 1952(a)(3)(A) (Count Six).

The defendants have filed motions challenging the indictment on various grounds, seeking to suppress evidence obtained from court-authorized wiretaps and search warrants, and certain other relief.  With the exception of defendant Saenz's motion for a hearing regarding his post-arrest statements,[2] none of the defendants' motions have merit. Specifically,

- the defendants' motions to dismiss various counts as "duplicitous" should be denied because the Indictment sufficiently alleges one conspiracy in which all defendants participated to advance the international trade based money laundering scheme;

- the defendants' motions for severance should be denied because, among other things, a joint trial of the defendants is proper, serves the interests of justice and judicial economy, and the defendants have failed to overcome the strong presumption for trying the defendants together;

- the court-authorized wiretaps and search warrants were supported by probable cause and, thus, evidence obtained pursuant to the lawful execution of those warrants should not be suppressed; and

- the defendants' various discovery motions, including defendants' Brady motions and motion for bills of particulars, should be denied because the government has properly produced discovery pursuant to the Federal Rules of Criminal Procedure and relevant case law.

---

[2] The government agrees that defendant Saenz is entitled to a hearing regarding his post-arrest statements, during which the government submits that it will establish that Saenz's post arrest statements were voluntary and admissible.

Accordingly, the defendants' motions should be denied in their entirety.

## STATEMENT OF FACTS

I.      **Factual Background**

   A.      **The Money Laundering Scheme**

Beginning in or about 2016, the U.S. Attorney's Office for the Eastern District of New York ("USAO EDNY") and agents and investigators with the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") began investigating a large-scale, international trade-based money laundering scheme involving a money laundering organization ("MLO") being operated out of South America by Nader Mohamad Farhat (the "Farhat MLO"). Farhat is a defendant in a related case. See United States v. Barakat et al., 18-CR-292 (JMA).[3] In connection with that investigation, HSI identified E. Khwaja and A. Khwaja as operating companies that serviced international money launderers in South America, largely the Farhat MLO.

By way of background, Farhat operated a currency exchange business in Paraguay. Farhat held himself out as an individual who could transmit and transport monetary instruments and currency to and from Paraguay throughout the world and, specifically, the United States of America. As a result, he had many customers interested in moving monies to and from the United States, including individuals involved in the smuggling and sale of illegal drugs from South America to the United States to facilitate that illegal trade. Farhat, together

---

[3] Farhat is also charged with money laundering conspiracy and related substantive counts in the United States District Court for the Southern District of Florida ("SDFL"). See United States v. Farhat, 17-CR-20865 (RAR). In or about June 2018, Farhat was extradited from Paraguay to the United States. Trial in the SDFL matter has been adjourned without date under an indefinite continuance due to COVID-19.

3

with others, acted as a money broker, utilizing unlicensed money transmitters in the New York Metropolitan area and elsewhere to expedite bulk cash transactions, as well as to deliver illegal monetary proceeds to companies in the United States involved in trade-based money laundering.  One set of companies involved in sending illegal monetary proceeds between South America and the United States for the Farhat MLO were the companies owned and operated by the Khwaja family.

In furtherance of the international money laundering operation, E. Khwaja and A. Khwaja used companies that they owned and operated – including, but not limited to, National Electronics, Inc. ("National"), Ishan International, Inc. ("Ishan"), Solid Electronics, Solid Wireless Inc. ("Solid Wireless"), ISK Corporation ("ISK") and Tronix Telecom ("Tronix") (collectively, the "Khwaja Companies") – as a primary conduit by the Farhat MLO to transfer tens of millions of dollars between the United States, Paraguay and other countries. See Affidavit of HSI Special Agent John M. Szwalek, Jr. in Support of Application for Search Warrants, dated November 13, 2018 ("Szwalek SW Aff."), at ¶¶ 6-7, annexed hereto as part of Exhibit A, together with the November 2018 Search Warrants issued in New York.  That is, the Khwaja Companies were used by the Farhat MLO to hide and launder monies using cellular telephones as the item used for the transfer of value.

Specifically, drug trafficking proceeds were deposited into various bank accounts of the Khwaja Companies of both E. Khwaja and A. Khwaja.  For example, defendants E. Khwaja, Bokhari and Melendez-Mendoza physically deposited bulk cash[4] into

---

[4] Including bulk cash that had been obtained by E. Khwaja during exchanges in various parking lots on Long Island.

certain bank accounts, whereas known money from drug traffickers and DEA undercover drops were deposited by wire in other bank accounts of Khwaja Companies owned by A. Khwaja.  These funds were then used by the Khwaja Companies to purchase cellular phones for use as the transfer of value to South America and to hide and launder monies for the Farhat MLO.  Id. at ¶11.  In particular, Khwaja Companies Tronix and ISK exported the cellphones to the Farhat MLO in South America.  Id. at ¶12.

Notably, the source and amount of cash receipts for the Khwaja Companies bore no relation to the purported actual business of selling cellular phones; rather, they related to the primary goal of the companies: trade-based money laundering ("TBML") for drug traffickers and money launderers.  Specifically, the Khwaja Companies received millions of dollars from entities with no identifiable business relationship with them.  Id. at ¶15-16.

Further, the Khwaja Companies engaged in a pattern of accepting structured postal money orders and identified drug trafficking proceeds as part of their business. Id. at ¶¶ 16-17.  All the defendants, with the exception of defendant Saenz, then structured the cash into the Khwaja Companies' various accounts in aid of the Farhat MLO.  Id. at ¶¶ 18-19.

In addition, a United States Customs and Border Protection ("CBP") review of select transactions of two of the Khwaja Companies – Tronix (E. Khwaja) and ISK (A. Khwaja) – revealed, even on a limited review, indicators of the TBML scheme at both companies.  Id. at ¶¶ 15-16, 40, 42.  These indicators included payments made by third parties with no connection to the business, internal layering and ISK's failure to reconcile invoices with payments as well as a trade discrepancy.  Id. at ¶¶ 24-26.

5

B.     **The Defendants**

E. Khwaja and A. Khwaja are cousins.   E. Khwaja was the owner of the following Khwaja Companies: Tronix and Sysco International ("Sysco").   E. Khwaja was a signor on the bank accounts for Tronix and Sysco.   E. Khwaja previously worked for National Electronics before creating Tronix.   E. Khwaja lives in Farmingdale, New York.

A. Khwaja was the owner of the following Khwaja Companies: National Electronics, ISK, Solid Electronics, Solid Wireless, Taban, and Ishan.  A. Khwaja was a signor on the bank accounts of National, Taban, and the Solid companies.  A. Khwaja lives in Syosset, New York.  Rhamatzada is the sister of A. Khwaja, and worked for National, ISK, the Solid companies, and Ishan, primarily as a bookkeeper.  Rhamatzada was also the President for ISK and Solid Wireless.  Rhamatzada lives in Farmingdale, New York.

Bokhari was an employee of E. Khwaja, and worked for Tronix and Sysco.  Bokhari was frequently listed as the point of contact on the exportation of cellular phones for Tronix.   He also engaged in the structuring of the cash deposits.   Bokhari also previously worked for ISK, Solid Wireless and Solid Electronics.  Bokhari lives in Miami, Florida.

Rahimi is the sister of E. Khwaja and was the bookkeeper for Sysco, Ishan, ISK, and National.  Rahimi lives in Farmingdale, New York.

Saenz worked at ISK and Solid Wireless as a manager and was employed by Rhamatzada and A. Khwaja.  Saenz was the conduit for the South American and Mexican clients for the MLO based on his Spanish speaking capabilities.  Saenz lives in Miami, Florida.

E. Khwaja managed Tronix from his residence and Rahimi and Rhamatzada worked out of their homes, at least some of the time.  In fact, A. Khwaja, as well as E. Khwaja, Rahimi and Rhamatzada routinely conducted their work from home.  Id. at ¶ 15.

## II.   **Procedural History**

### A.   **Wiretaps of Certain Phones**

On June 2, 2017, the USAO EDNY submitted an application seeking authorization to intercept telephone calls on two cellular telephones used by the defendant E. Khwaja and subscribed to by Tronix (the "Wiretap Application").  See Wiretap Application and Order, Misc. 17-1579, annexed hereto as part of Exhibit B.  The Wiretap Application included, inter alia, affidavits from Assistant United States Attorney Burton T. Ryan, Jr. (the "Ryan Wire Aff.") and HSI Special Agent John Szwalek (the "Szwalek Wire Aff.") that detailed the overwhelming probable cause for the wiretaps, the objectives of the investigation, and the alternative investigative techniques that were tried and failed or were unlikely to succeed.  Id.

Significantly, regarding the initial wiretap, the Szwalek Wire Aff. set forth evidence that E. Khwaja was engaged in international money laundering as part of the Farhat MLO.  First, the investigation and records demonstrated a re-exportation procedure to justify acceptance of the illicit proceeds.  See Ex. B, Szwalek Wire Aff., at ¶¶ 13-14.  As set forth in the Szwalek Wire Aff., the Farhat MLO facilitated its money laundering through the purchase of cellphones in the United States with illicit funds, after a series of transactions.  The phones were then exported from the United States and sold in South America.  This series of layered transactions launders the funds for various drug trafficking organizations.  Id. at ¶ 14.  E.

7

Khwaja used this method and variations of this method to launder money.  For example, in one method of layered transactions utilized by E. Khwaja, the cellular phones were purchased with illicit funds and then exported to South America.  However, the cellular phones were not sold and were eventually shipped back to the United States and re-exported to South America.  The re-exportation of cellular phones was an effort to legitimize additional illicit funds through additional fraudulent invoices.  The same individual shipment of cellphones was repeatedly transferred in commerce between the United States and South America and used to legitimize numerous wire transfers, as if there were multiple shipments and multiple sales of cellphones.  This one shipment of cellphones continually rotating between the United States and South America gives the appearance of multiple separate shipments or separate orders of cellphones.  Id.  Second, from January 2014 through March 2017, import/export records revealed that Tronix had exported cellular telephones collectively valued over $30 million from the United States to various countries, such as Paraguay, Trinidad and Tobago, Suriname, Guyana, Colombia and Panama.  During that same time period, Tronix only imported cellular telephones collectively valued at approximately $6 million from various countries, such as the United Arab Emirates and Hong Kong, China.  Id. at ¶ 13.  Third, E. Khwaja's company, Tronix, sent over one hundred shipments of cellphones totaling over $4.6 million dollars to a company associated with the Farhat MLO, a company that had accepted illegal drug trafficking proceeds.  Id. at ¶ 20.

Fourth, the Szwalek Wire Affidavit set forth a series of texts and WhatsApp messages that evidenced practices associated with money laundering, including accepting bags

of cash in parking lots, accepting delivery of hundreds of thousands of dollars from Farhat's associate and having similar amounts delivered to E. Khwaja's home.  Id. at ¶¶ 22-23, 28-35.

 In addition to detailing the probable cause, the Wiretap Application also sets forth the objectives of the investigation.  Id. at ¶ 10.  Specifically, it stated:

> There is probable cause to believe that the interception of wire communications, the authorization, for which is sought herein, will continue to reveal: (1) the nature, extent and methods of operation of the international narcotics trafficking and money laundering business of the TARGET INTERCEPTEES;[5] (2) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (3) the distribution and transfer of the money involved in those activities; (4) the existence and location of records; (5) the existence, location, and source of resources used to finance their illegal activities; (6) the existence, location, and disposition of the proceeds from those activities; and (7) the existence and location of items used in furtherance of narcotics trafficking and money laundering.  In addition, the wire communications are expected to constitute admissible evidence of the above-described offenses.

Id. at ¶ 11.  Those objectives could only be achieved by the use of electronic surveillance.

 The Wiretap Application comprehensively documented all the investigative techniques that were too dangerous to employ, had been employed and failed to achieve the objectives of the investigation, or were unlikely to succeed.  Id. at ¶¶ 96-121. The Wiretap Application also showed that the investigation used many of these other techniques, which had failed to expose the full extent of the criminal conduct or to identify all the co-conspirators.

 On June 2, 2017, after reviewing the Wiretap Application, the Honorable Joanna Seybert, United States District Court Judge for the Eastern District of New York, authorized

---

[5] Identified in the Wire Application as, among others, the defendants.

the interception of calls for two cellular telephones used by E. Khwaja and subscribed to by his company, Tronix.  See Judge Seybert's Order, dated June 2, 2017, annexed hereto as part of Exhibit B.   During the authorized time period, HSI intercepted numerous calls demonstrating that the defendants E. Khwaja and Melendez-Mendoza were engaged in money laundering.  See Ex. B, Szwalek Wire App., at ¶¶ 31-39.

Thereafter, for the following seven months, Judge Seybert and several other United States District Judges reauthorized wiretaps on certain phones and authorized additional wiretap orders on other phones as set forth below.  All the wiretap orders and all the applications for the Orders are attached, collectively, as Ex. B (In the Matter of the Application for Wiretaps, Misc. 17-1579).

On or about June 30, 2017, the Honorable Joseph F. Bianco, United States District Court Judge for the Eastern District of New York, issued an Order authorizing the continuation of the interception of wire communication for the same cellular telephones of E. Khwaja, and authorizing the interception of the cellular telephone of Melendez-Mendoza.  Id.

On or about July 31, 2017, the Honorable Judge Bianco issued an Order authorizing the continuation of the interception of wire communication and electronic communications for the cellular phones of E. Khwaja and the cellular telephone of Melendez-Mendoza, and authorizing the  interception of wire communication for the cellular telephone of Bokhari and the Tronix landline telephone.  Id.

On or about August 30, 2017, the Honorable Judge Bianco issued an Order authorizing the interception of wire communication and electronic communications for the cellular telephone of Rhamatzada and the continuation of intercepts for the cellular telephones

10

of E. Khwaja and Melendez-Mendoza, as well as the Tronix landline. Id.  The probable cause for the Rhamatzada phone is discussed in the argument section.

On or about September 28, 2017, the Honorable Joanna Seybert, United States District Court Judge for the Eastern District of New York issued an Order authorizing the continuation of the interception of wire communication and electronic communications for the cellular telephone of Rhamatzada, the cellular telephone of Melendez-Mendoza, and the cellular telephone of E. Khwaja.  Id.

On or about October 28, 2017, the Honorable Arthur D. Spatt, United States District Judge for the Eastern District of New York, issued an Order authorization the continuation of the interception of wire communication and electronic communications for the cellular telephone of Rhamatzada, the cellular telephone of Melendez-Mendoza, and the cellular telephone of E. Khwaja.  Id.

On or about November 29, 2017,  the Honorable Judge Bianco issued an Order authorizing the continuation of the interception of wire communication and electronic communications for the cellular telephone of Melendez-Mendoza and the cellular telephone of E. Khwaja.  Id.

On or about December 29, 2017, the Honorable Judge Spatt issued an Order authorizing the continuation of the interception of wire communication and electronic communications for the cellular telephone of Melendez-Mendoza and the cellular telephone of E. Khwaja.  Id.

On or about January 29, 2018, the Honorable Judge Bianco issued an Order authorizing the continuation of the interception of wire communication and electronic

11

communications for the cellular telephone of Melendez-Mendoza, and authorizing the interception of wire communication for the cellular telephone of Rahimi. Id. The probable cause for the Rahimi wiretap is discussed in the argument section.

All agents and monitors assigned to the wire interceptions were trained to minimize in compliance with federal law. See Affidavit of HSI Special Agent John M. Szwalek, Jr. in Opposition to Defendants' Omnibus Motions dated May 19, 2020, attached hereto as Affidavit 1 at ¶¶ 10-12.

Minimization was conducted for each wiretap order. Since most of the interceptions were conducted in a foreign language, in this case Dari, the native language of some of the defendants, agents were unable to ascertain what was being communicated between the parties at the outset of such calls. Nevertheless, monitors continually minimized conversations. Examples of such minimization are set forth in the Minimization Section below on page 57. Consistent with the Wiretap Application, approximately a thousand intercepted calls were minimized. See Affidavit 1 at ¶13.

### B.    The July 2017 Search Warrant

On July 28, 2017, the Honorable Anne Y. Shields, United States Magistrate Judge for the Eastern District of New York, authorized a search for information associated with the email account ranar@syscoint.com that was controlled by GoDaddy.com, LLC (the Rahimi Email Search Warrant"). See Copy of the July 28, 2017 Application and Search Warrant annexed hereto as Exhibit C. As set forth in the Affidavit of HSI SA John Szwalek, Jr. (the "Szwalek Rahimi Email SW Aff."), part of Ex. C, there was probable cause to search Rahimi's emails for evidence of money laundering conspiracy, structuring and related

12

substantive crimes.  See Ex. C at ¶¶ 11-21.  The affidavit in support of the search warrant outlined the evidence demonstrating the use of Rahimi's email in the operation of the Khwaja Companies, companies that were permeated by illegality, including money laundering, structuring and other forms of concealment and criminality. Id. at ¶¶ 7-10).  The email search warrant included a time frame and limited the relevant emails to the time period since January 1, 2014. See Ex. C, Page 22.

### C.   The Indictment

As a result of the conduct described above, on November 7, 2018, a federal grand jury sitting in the Eastern District of New York returned a six-count indictment against the defendants.  Specifically:

Count One of the Indictment charges all the defendants with participating in a conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1), 1956(a)(2), 1956(a)(3) and 1957 (see Ind. at ¶¶ 14-15);

Count Two of the Indictment charges E. Khwaja, Melendez-Mendoza and Bokhari with the operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Id. at ¶¶ 16-17);

Count Three of the Indictment charges E. Khwaja, Melendez-Mendoza and Bokhari with causing the failure to file currency transaction reports ("CTRs"), in violation of 31 U.S.C. §§  5324(a)(1), 5324(d)(1), and 5324(d)(2) (Id. at ¶¶ 18-19);

Count Four of the Indictment charges E. Khwaja, Melendez-Mendoz and Bokhari with causing the failure to file IRS 8300 reports, in violation of 31 U.S.C. §§ 5324(b)(1), 5324(d)(1), and 5324(d)(2) (Id. at ¶¶ 20-21);

13

Count Five of the Indictment charges all defendants, except defendant Saenz, with structuring financial transactions, in violation of 31 U.S.C. §§ 5324(a)(3), 5324(d)(1), and 5324(d)(2) (Id. at ¶¶ 22-23); and

Count Six of the Indictment charges all defendants with interstate and foreign travel and transportation in aid of a racketeering enterprise, in violation of 18 U.S.C. §§ 1952(a)(1)(A), and 1952(a)(3)(A) (Id. at ¶¶ 24-25).

In addition, the Indictment contains five pages identifying the defendants' and their respective companies, and outlining the money transmitting business license requirements and the currency reporting requirements.  Id. at ¶¶ 1-13.

**D.      The November 2018 Search Warrants of Certain Offices and Homes**

**1.      The Applications and Corresponding Search Warrants**

On November 13, 2018, the Honorable Anne Y. Shields, United States Magistrate Judge for the Eastern District of New York, authorized a search of the offices of the Khwaja Companies in Farmingdale, New York, as well as the homes of E. Khwaja, A. Khwaja, Rahimi and Rhamatzada (the "November 13 Search Warrants").  See Copy of the November 13 Application and Search Warrants, collectively, annexed hereto as Exhibit A.  As set forth in Ex. A, there was probable cause to search the offices and the defendants' homes. See Ex. A at ¶¶ 6-71; 80-87.  The Indictment was attached and incorporated by reference.

On November 14, 2018, the Honorable Jonathan Goodman, United States Magistrate Judge for the Southern District of Florida, authorized a search of the offices of the Khwaja Companies in Florida at two different locations, Tronix and Sysco in Doral, Florida ("E. Khwaja Companies") and ISK, Solid Wireless and Solid Electronics in Miami, Florida

14

("A. Khwaja Companies") (the "November 14 Search Warrants").  See Copy of the November 14 Application and Search Warrants annexed hereto as Exhibit D.  As set forth in the Affidavit of HSI Special Agent Zulay Nunez ("Nunez SW Aff."), there was probable cause to search the offices in Florida.  See Ex. D at ¶¶ 5-46.

Regarding probable cause for the November 2018 search warrants, during the wiretaps, numerous telephone calls were intercepted that demonstrated E. Khwaja, A. Khwaja, Rahimi, Rhamatzada and others were involved in a money laundering scheme that flowed through New York and Florida to South America.  Id. at ¶¶ 31-46.  The wiretaps also showed that E. Khwaja, A. Khwaja, Rahimi and Rhamatzada were working on the Khwaja Companies work from home exclusively or partially. In addition to the wiretap evidence that established probable cause to search the offices and the homes, as set forth in the Szwalek SW Aff. (Ex. A at ¶¶ 43-53), and the Nunez SW Aff. (Ex. D at ¶¶ 38-47), the government had developed additional evidence of the defendants' money laundering scheme as the result of other investigative techniques including financial investigation.

The Szwalek SW Affidavit, which attached the underlying Indictment in this case, and the Nunez SW Affidavit, which summarized that Indictment, provided overwhelming probable cause that E. Khwaja, A. Khwaja, Rahimi and Rhamatzada, among others, were engaged in TBML through the Khwaja Companies.  Business practices included internal layering with "phantom" invoices, trade discrepancies and receipt of illegal drug proceeds.  See Ex. A, Szwalek SW Aff., at ¶¶ 25-31; Ex. D at ¶¶ 14-15.  The application demonstrated that the TBML work, together with other criminality concealing the TBML such as structuring, was done not only at the Farmingdale and Florida offices but also at the homes

15

of E. Khwaja, A. Khwaja, Rahimi and Rhamatzada.  See Ex. A, Szwalek SW Aff., at ¶ 15.

Notably, E. Khwaja received bulk cash deliveries and third party checks at his residence as did

another residence that was searched.  Id. at ¶¶ 15, 41.

        In addition, surveillance, wire interceptions and precision location data

demonstrated that E. Khwaja operated his business, Tronix, from his home in Farmingdale.

Id. at ¶ 39.  E. Khwaja picked up bags of cash in parking lots on Long Island and brought the

cash back to his home in Farmingdale, where he then packaged and sent the cash via FedEx to

Tronix in Florida.  FedEx records indicate that E. Khwaja sent and/or received approximately

150 packages over an 18-month period (January 2016 to June 2017).  Id. at ¶ 48.

        For her part, defendant Rahimi was the bookkeeper for many Khwaja

Companies.  She worked from home and kept books and records there.  Bank records of the

Khwaja Companies' accounts involved in the money laundering were mailed to her home.

Wire intercepts with precision location data confirmed that she worked from home and records

of various Khwaja Companies were kept there.  Id. at ¶¶ 54, 56-63.

        Likewise, defendant Rhamatzada worked for the Khwaja Companies from her

home in Farmingdale, New York, where she maintained books and records for the Khwaja

Companies.  Id. at ¶¶ 64-65, 67-70.

        A. Khwaja used his residence to receive bank records for accounts used to aid

the TBML.  While the registered owner of National, A. Khwaja's company, is another

company named Hamd Associates, A. Khwaja is identified as the president of the company

and his home address is the mailing address for the business.  Id. at ¶¶ 82, 84.  Border searches

of A. Khwaja demonstrated that he used services on his phone, including the WhatsApp

16

messaging platform and text messaging, to communicate with co-conspirators about the money laundering scheme. The phone was expected to be in A. Khwaja's possession and seized for evidence at the time of the execution of the search warrant and arrest. Id. at ¶¶ 85-87.

The November 13, 2018 and November 14, 2018 Search Warrants authorized the search of these premises for and seizure of evidence of money laundering, unlicensed money remitting, structuring and the failure to file CTRs and Form 8300 reports, and interstate and foreign travel in aid of racketeering enterprises. Indeed, the warrants stated:

> The properties to be searched and seized is [sic] evidence, fruits and instrumentalities relating to violations of Title 18, United States Code, Section 371 (conspiracy to defraud the United States); Title 18, United States Code, Section 1956(h) (money laundering conspiracy); Title 18, United States Code Section 1956 (money laundering); Title 18, United States Code Sections 1960 (unlicensed money remitting); Title 31, United States Code, Sections 5324 and 5331 (structuring and failure to file CTRs and Form 8300 reports); and Title 18, United States Code, Section 1952 (interstate and foreign travel in aid of racketeering enterprises) (collectively, the "SUBJECT OFFENSES").

See November 13, 2018 and November 14, 2018 Search Warrants annexed hereto, as part of Exhibit A and Exhibit D, respectively.[6] Among the evidence, fruits and instrumentalities to be searched and seized, the search warrants further directed searching officers that such materials which were evidence, fruits and instrumentalities of the specified Subject Offenses could include:

1.   Any and all United States and foreign currency.

2.   Any and all business books and records relating to the Subject Premises and Subject Vehicle, including: accounts    receivable,    accounts    payable,    cash

---

[6] The Florida search warrants for the two offices also included wire fraud and mail fraud as two of the Subject Offenses.

disbursements, general journal, cash receipts, work papers, correspondence, copies of tax returns, employee records, payroll records, memoranda, bank statements, bank deposit slips, money order and money order receipts, cancelled checks, drafts, wire transfers, records of and any other documentary and/or physical items relevant to the monetary transactions.

3.   Any and all documents or forms containing information used or designed for use in filing any federal, state or local income tax return and/or employment tax return.

4.   Any and all work papers, schedules, summaries or other documents used or designed for use to prepare documents described above.

5.   Any and all records in the names of [E. Khwaja, Melendez-Mendoza, Bokarhi, Farhat, Rahimi,] Ebadullah Khwaja, Zabiullah Khwaja, [Rhamatzada, A. Khwaja,] Nadia Khwaja, [Saenz], Omar Butt, Akihiko Kaji, Hesamuddin Khwaja, Sayed Abdul, Majid Khwaja, Ibrahim Khwaja, Mahmud Khwaja, Ishan Maqsood Khwaja, Vicki Morales, Sayed Abdullah Khwaja, Ibrahim Khwaja, Sayed Mustafa Khwaja, including U.S. passports; foreign passports; travel records; financial records including evidence of disposition of income, including but not limited to: banking records, real estate records (in the USA and abroad); records substantiating purchase of capital assets (vehicles, boats, etc.); investments, including but not limited to investments in Tronix Telecom, Sysco International, Popular Electronics, Wireless Hub, Gotham Discounts, National Electronics, Solid Wireless, Solid Electronics, ISK Corporation, Taban Company, Ishan International, Roslyn Associates and Hamd Associates.

6.   Any computer, computer system and related peripherals, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, systems disk operating system, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, mobile

18

telephones, internet access devices, digital cameras and memory cards, scanners, and any electronic data storage devices including but not limited to hardware, software diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and other storage mediums, any input/out peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to store financial data.

7. Any and all cameras, smartphones, and cellular telephones.

8. Any and all credit card and other financial information, including but not limited to bills and payment records, reflecting evidence of money laundering, operating an unlicensed money transmission business and failure to file [CTRs].

9. Any and all import and export documentation, including but not limited to, air waybills, invoices, sales orders, purchase orders, warehouse receipts from freight forwarders, customs forms, and shippers export declarations.

See Ex. A, Attachment A to Search Warrants.

The search of the office premises in Farmingdale was intended to obtain the business records of the Khwaja Companies. Similarly, the search of the office premises in Florida, being offices for Tronix, Sysco, ISK, Solid Wireless and Solid Electronics were intended to obtain the business records of those Khwaja Companies. Due to redactions by the issuing magistrate judge, the November 14 Search Warrants in Florida covered a slightly reduced scope of documents than the November 13 Search Warrants in New York. See Ex. A (November 13 Search Warrants); Ex. D (November 14 Search Warrants); Affidavit 3.

19

## 2.   Operational Briefing of the New York Search Warrants

On November 13, 2018, at approximately 1400 hours at the Central Islip Court House, HSI SA Szwalek, SA Richard Branda and Group Supervisor Andrew Borra briefed the team leaders and law enforcement partners on the planned execution of seven federal search and arrest warrants in the Eastern District of New York, in connection with the arrests of E. Khwaja, A. Khwaja, Rahimi and Rhamatzada on money laundering charges and other financial crimes and searches of the related properties.   Individual team target folders were created, which included copies of the search warrants, operation plan, and personnel assignments.   In sum and substance, each of the seven locations were explained to each of the seven team leaders and the operation plan was read.   The information relayed to and discussed with the team leaders included: a history and explanation of the investigation; sections of the affidavit in support of the issuance of the New York search warrants was read; the charges/violations and the time frame for responsive documents to be that reflected in the indictment (Affidavit 1 at ¶ 17); the fact that four of the search warrant locations were in close proximity of each other; personnel assignments; specific evidence, such as the cellular phones of the now defendants; the processing of the defendants upon arrest; the protocol for bringing evidence back to the HSI office at 545 Federal Plaza, Central Islip; and the meet location for the day of execution.   In particular, agents were instructed to seize all evidence, fruits and instrumentalities of the specific crimes identified in Attachment H that were bulk cash, electronic devices used in the operation of the Khwaja Companies or documents since October 2013 as listed on the attachment. See Affidavit 1 at ¶ 17.

20

Furthermore, agents were specifically instructed to adhere to the dates of the conspiracy set forth in the Indictment (i.e., October 2013 through November 2018) when searching and seizing items from the residences and business. These dates were also written down on a copy of the Search Warrant for "239 Carnation," the residence of E. Khwaja, which copy was used during the briefing by SA Szwalek. Id. at ¶ 17.

### 3. Operational Briefing of the Florida Search Warrants

On November 14, 2018, at approximately1400 hours at the Miramar HIDTA office in Miramar, Florida, HSI SA Michael Reinosa, SA William Harnett and Group Supervisor Philip Goode briefed the team leaders and law enforcement partners on the planned execution of two federal search and three federal arrest warrants in the Southern District of Florida, in connection with the arrests of Saenz, Bokhari and Melendez-Mendoza on money laundering charges and other financial crimes and searches of the two related office properties. Individual team target folders were created, which included copies of the search warrants, operation plan, and personnel assignments. In sum and substance, each of the five locations were explained to each of the five team leaders and the operation plan was read. The information relayed to and discussed with the team leaders included: a history and explanation of the investigation; the charges/violations and the time frame for responsive documents specifying October 2013 to date; personnel assignments; specific evidence, such as the cellular phones of the now defendants; the processing of the defendants upon arrest; the protocol for bringing evidence back to the HSI office at SAC, Miami; and the meet location for the day of execution. In particular, agents were instructed to seize all evidence, fruits and instrumentalities of the specific crimes identified in Attachment H that were bulk cash,

21

electronic devices used in the operation of the Khwaja Companies or documents since October 2013 as listed on the attachment. See Affidavit of William Harnett, dated April 28, 2020 annexed hereto as Affidavit 2.

Furthermore, agents were specifically instructed to adhere to the dates of the conspiracy set forth in the Indictment (i.e., October 2013 through November 2018) when searching and seizing items from the two businesses.  Id.

### 4.  Execution of the November 2018 Search Warrants

On November 15, 2018, law enforcement officers conducted the court-authorized search of the offices of the Khwaja Companies and the homes of E. Khwaja, A. Khwaja, Rahimi and Rhamatzada in New York (seven locations including offices and homes) and Florida (two offices).

### 5.  Post-Execution Analysis of Seized Materials

#### a.  Review of Seized Hard Copy Documents

Following the execution of the search warrants, the government searched the hard copy documents seized immediately after their seizure and returned those found to be irrelevant.  See Affidavit 1 ¶ 44.  Those documents determined to be relevant and subject to the search warrant were produced in discovery, pursuant to Fed. R. Crim. P. 16.  The cover letters memorializing each production are attached hereto as Exhibit E.

#### b.  Searches of the Seized Electronic Material

With respect to the electronic devices seized pursuant to the court-authorized search warrants, the government seized a total of 33 cellular phones, 65 computers/tablets/laptops, and 143 media storage devices at the defendants' residences and

offices.[7]  See Affidavit 1 at ¶ 20.   The government searched the electronic evidence only in connection with this prosecution.   For details on the steps taken with respect to electronic devices seized from each location, see Affidavit 1 at ¶¶ 28-43.

In summary, as with the hard copy documents, the process of searching the electronic evidence seized in New York started on the day of the execution of the search warrants.   The search of the electronic evidence seized in Florida started the following week when the images made and the original electronic equipment was brought to New York.   For both New York and Florida seizures, the imaging process conducted on-site was consistent with the procedure outlined in the application for the search warrants.[8]   See Ex. A at ¶¶ 98-103; Ex. D at ¶¶ 47-52; Affidavit 1 at ¶¶ 21-28.   Similarly, actions taken including seizure of cellular phones and the imaging process were consistent with the affidavit for the search warrants.

The process differs for certain items.   With respect to the thumb drives and hard drives,[9] the devices were hooked up to a write blocker[10] to create a forensic image.   A forensic agent then put the forensic image into forensic software.   This two-step process made the hard

---

[7] In addition to those five locations, agents seized 9 computers/laptops, 4 tablets, thirteen cellular phones, nine media storage devices and various documents from two additional locations authorized by the search warrants.

[8] Agents imaged two servers, five cellular phones, 40 computers, and 28 media storage devices onsite.

[9] A total of 178 items.

[10] A write blocker is a specialized type of computer hard disk controller made for the purpose of gaining read-only access to computer hard drives without the risk of damaging the drive's contents.

23

drive or thumb drive searchable.  Generally, agents cannot review anything except an image for search purposes.  See Affidavit 1 at ¶ 29.

Depending on the size of the content (megabytes v. terabytes) of the device, these steps can take anywhere from forty minutes to a matter of days.  The hard drive on a typical computer takes one agent two days from hooking the device up to write blocker software to turning the searchable forensic image over to the searching agent.  The standard practice is to have one person create the searchable forensic images because that person will be a witness at trial.  However, due to the volume of material seized (i.e., 18.6 terabytes), from the day of the execution of the search warrant, the government has had multiple forensic agents perform this task.  Id. at ¶ 30.  Once a forensic image was produced, it was reviewed by an agent.  This process was simultaneously being completed on multiple electronic devices.  Id. at ¶ 31.  The government searched forensic images of the electronic material, as the original devices were either imaged on the day of the search (and, thus, not physically removed from the premises) or returned to the defendants, as identified above.

As to cellphones, unlike thumb drives and hard drives, cellphones must be turned on for extraction because there is no hard drive to image as they consist, in their core, of memory chips on a board.  Id. at ¶ 32.  Here, starting on the day of the search, the phones was initially hooked up to Cellebrite software.  Id. at ¶ 33.  Using the Cellebrite software, a forensic agent conducted extractions of data from the applications on the phone including, for example, text messages, Whats App communications and photographs.  Id. at ¶ 34.  Thirty-three cellphones were seized from all locations; five additional cellphones were imaged on-site.  Id. at ¶ 35.

24

In total, the government seized approximately 18.6 terabytes of electronic material.  Id. at ¶ 36.  As noted above, given the volume of electronic material and information seized, the government had many agents working on searching the electronic evidence.  Using a team of approximately eight full-time agents, including forensic agents, the government searched cellphones, hard drives, thumb drives and computers.  Id. at ¶ 37.  For WhatsApp messages on the 33 cellphones, eight cellphones had to be searched manually one page at a time.  Id. at ¶ 38.  Despite the magnitude of the search, the entire search of seized materials, except for WhatsApp messages, was *completed* in less than ten months.  Id. at ¶ 39.

As set forth above, the government either returned the original devices or provided images of the devices to the respective defendants.  Of that universe of material, the government identified those items that were discoverable pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  Further, from that subset of Rule 16 discoverable material, the government highlighted certain portions of the discovery for the defendants.  During the time that the government was searching the seized evidence, the government was producing discovery.  First, shortly after the searches, the government produced the evidence arising out of the wiretapped conversations.  See Affidavit 1, at ¶¶ 59-60 for further details of discovery.

**5.    The Government Supplied its Search Protocol**

The government has repeatedly identified the search protocol used for searching all electronic material including the imaged computers, including their hard drives, to the Court and the defendants.  See the Government's correspondence to the Honorable Joan M. Azrack, dated June 14, 2019 and June 21, 2019, which are attached hereto as Exhibit F.

With respect to searching the electronic devices, as discussed above, the material was placed in searchable formats.  This process was commenced by forensic agents within days after the November 15, 2018 searches.  See Affidavit 1 at ¶ 40.  The search protocols used by the reviewing agents derived from the language and limitations of the respective search warrant including the time range listed in the Indictment.  Once the forensic agents created a searchable image, a search was done by date in order to limit the universe to dates within the parameters of the search warrants as the agents understood them; specifically, the relevant time period for the search was October 2013 through November 2018, as set forth in the Indictment attached to the affidavit in support of the November 13 Search Warrants.  Non-responsive areas of the imaged electronic device were segregated as non-relevant.  Id. at ¶ 41.

Using the time relevant subset, agents used keyword searches.  In particular, a search of names (both of individuals and businesses) was done to obtain all documents within the relevant time period that mention either a company or individual identified in the search warrant whose records are within the scope of the search warrant.  Id. at ¶ 42.

The time relevant subset was also searched for English and Spanish words believed, from an investigative standpoint, to be relevant.  For example, words relating to the crimes identified in the search warrants – e.g., cash, dinero, money, invoices, statements – were used as a subset to search the time relevant subset.  Id. at ¶ 43.  As with all steps, identified documents that were not responsive to the search warrant were segregated as non-relevant, not photocopied and returned to the defendants.  Id. at ¶ 44.

Lastly, agents conducted additional searches using search terms based upon the contents of retrieved relevant documents and information continuously received from individuals with knowledge of defendants' money laundering operations.  Id. at ¶ 43.

As discussed in the government's June 21, 2019 letter, part of Ex. F hereto, search protocols, of necessity, evolve during searches due to misspellings and terms and codes learned from proffers, informants, and examination of the electronic device(s) itself.  See Ex. F, June 21, 2019 letter, at Page 5.  As the United States Court of Appeals for the Second Circuit stated:  "...even very simple codes can defeat a pre-planned word search." United States v. Ulbricht, 858 F.3d 71, 102 (2d Cir. 2017).  Here, where the entire corporate structure was a front and the Khwaja Companies consistently received funds unrelated to any legitimate business and, instead only related to funds stemming from illegal sources such as national and international drug trafficking, masking of transactions is necessary because the Khwaja Companies were not creating files that said "A. Khwaja Drug Trafficking Proceeds to Send to Diesel (Farhat)."

In fact, the evidence will show that defendants took efforts to mask their criminal conduct including the use of multiple wires for a single transaction and falsified business records including, but not limited to, the creation of sales journals showing purported sales to companies operated by undercover agents of the U.S. Government that had not purchased any materials from the Khwaja Companies but had merely delivered funds or sent wires to the  Khwaja Companies after confirming the funds were drug proceeds. See Affidavit 1 at ¶¶ 3, 6.

27

### E.     Defendant Saenz's Arrest and Post-Arrest Statements

On November 15, 2018, defendant Saenz was arrested at the ISK and Solid Wireless/Solid Electronics offices in Miami, Florida, pursuant to a valid arrest warrant issued on the Indictment.  He was not thrown against the wall prior to his interview.  At the time of his arrest, Saenz was read his Miranda rights, after which he stated that he was willing to talk to law enforcement.  At approximately 10:59 a.m., after Saenz was read his Miranda rights in English and Spanish, and prior to his interview, Saenz was provided with a written waiver of rights, in Spanish, which he read and signed.  See Miranda Waiver of Rights, signed by Saenz on November 15, 2018, attached to Affidavit 2.  Following the execution of the written waiver, agents interviewed Saenz for approximately one hour.  While the interview was conducted in English, as Saenz speaks English fairly well, a Spanish interpreter was present for the entire interview.  Saenz choose to communicate in English and not use the interpreter; however, for any questions that Saenz did not understand, the Spanish interpreter clarified the question.  The handwritten and typed notes of the interview are attached to Affidavit 2.

### F.     The Government's Rule 16 Discovery Productions

The government began producing discovery shortly after the Indictment was returned and has done so on a rolling basis.  Pursuant to Federal Rule of Criminal Procedure, the government has produced discovery on the defendants as follows:  November 30, 2018 (E. Khwaja, A. Khwaja, Rahimi and Rhamatzada); January 28, 2019 (Rahimi); February 15, 2019 (Saenz and Melendez-Mendoza); June 12, 2019 (E. Khwaja and Melendez-Mendoza); June 13, 2019 (all defendants); September 16, 2019 (all defendants); October 8, 2019 (all defendants); and March 16, 2020 (Saenz's new attorney).  As a result of the scope and

complexity of the defendants' criminal conduct, the discovery has been extensive, consisting in large part of wiretap communications, email communications, forensic images of cellular phones, computers, laptops, thumb drives and hard drives, bank records and other financial documents.

### G.   The Defendants' Pretrial Motions

On March 6, 2020 (A. Khwaja, Rhamatzada and Rahimi), March 9, 2020 (E. Khwaja), March 10, 2020 (Bokhari), and April 20, 2020 (Saenz), the defendants filed the instant motions.   Where noted, defendants E. Khwaja, Rahimi, Bokhari and Saenz join defendants A. Khwaja and Rhamatzada's Joint Def. Mem.  For the reasons set forth below, unless otherwise noted, all of the defendants' claims are without merit and should be denied.

29

## ARGUMENT

## POINT I

## DEFENDANTS' MOTIONS
## TO DISMISS SHOULD BE DENIED

Defendants A. Khwaja and Rhamatzada request that the Court dismiss the conspiracy to commit money laundering count (Count One) and the substantive counts charging structuring of financial transactions and the interstate and foreign travel and transportation in aid of a racketeering enterprise (Counts Five and Six) of the Indictment, or in the alternative, sever those counts from the upcoming trial.  See Joint Def. Mem. at 8-16. Defendant E. Khwaja joins in this motion with respect to Count One.  See E. Khwaja Mem. at 3-5.  Defendant Saenz joins in this motion with respect to Counts One and Six.  See Saenz Mem. at 1, 4.  For the reasons set forth below, their motions should be denied.

### I.  Applicable Law

#### A.  Sufficiency of an Indictment Pursuant to Fed. R. Crim. P. 7

For an indictment to be sufficient, it must give the defendant notice of the charge against him.  Federal Rule of Criminal Procedure 7(c) requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  It is well-established that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)); see also United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013).  When determining whether

or not a count sufficiently alleges a violation, the indictment should be read "in its entirety." United States v. Hernandez, 980 F.2d 868, 871 (2d Cir. 1992).

An indictment is "impermissibly duplicitous" when it "combines two or more distinct crimes into one count" and "the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (citing United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)); United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992). As the Second Circuit held in United States v. Margiotta, 646 F.2d 729 (2d Cir. 1981), "'if the doctrine of duplicity is to be more than an exercise in mere formalism, it must be invoked only when an indictment affects the policy considerations' that underlie that doctrine." Id. at 732-733 (quoting Murray, 618 F.2d at 897). The Court of Appeals in Margiotta explained the policies underlying the concern about duplicity as follows:

> [A]voiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the juror may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

646 F.2d at 733 (citing Murray, 618 F.2d at 896); Sturdivant, 244 F.3d at 75. Thus, a count of an indictment is "impermissibly duplicitous" only where the failure to charge the offenses as separate counts "risks unfairness to the defendant." Margiotta, 646 F.2d at 733.

The Second Circuit has cautioned that a "conspiracy indictment presents unique issues in the duplicity analysis because a single agreement may encompass multiple illegal objects." Aracri, 968 F.2d at 1518 (internal quotation marks omitted). That is why "the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the

31

conspiracy is the crime and that is one, however diverse its objects." Id. (internal quotation marks and alternations omitted).  Indeed, it has long been recognized that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme, even in the face of complaints about possible duplicity.  United States v. Sturdivant, 244 F.3d 71, 76 (2d Cir. 2001) (citing United States v. Tutino, 993 F.2d 1125, 1141 (2d Cir. 1989)).

Consequently, as long as "the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." United States v. Rajaratnam, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010); see also United States v. Friedman, 854 F. 2d 535, 561 (2d Cir. 1988) ("Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury.").  "'Boilerplate allegations' of a single conspiracy survive this 'facial test.'" Rajaratnam, 736 F. Supp. 2d at 688 (quoting United States v. Ohle, 678 F. Supp. 2d 215, 222-23 (S.D.N.Y. 2010)).  Applying this standard, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." Ohle, 678 F. Supp. 2d at 222.

Moreover, "[t]he remedy for a duplicitous indictment before trial is reformulation rather than dismissal." Federal Criminal Practice; a 2nd Circuit Handbook, 19th Ed., p. 503, Gleeson, et al. (2019) (citing United States v. Droms, 566 F.2d 361, 363 n.1 (2d Cir. 1977) ("Duplicity, of course, is only a pleading rule and would in no event be fatal to the count.")); Etienne v. United States. No. 05-CR-353, 2011 WL 1044956, at *2 (S.D.N.Y. Mar. 17, 2011) ("It may be added that, if the count in question were duplicitous, and if petitioner's counsel had objected, the result would not have been dismissal, as petitioner assumes, but an

32

amendment of the charges to eliminate duplicity."). Instead, "courts can employ alternatives that are less drastic than dismissal, such as instructing the jury that it must be 'unanimous as to the conduct underlying the conviction,'" United States v. Barret, No. 10-CR- 809 (KAM), 2011 WL 6780901, at *2 (E.D.N.Y. Nov. 27, 2011) (quoting Sturdivant, 244 F.3d at 79)); United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991) ("[A]ny possibility of a duplicitous verdict was removed by [the Judge's] careful charge.").

Indeed, dismissal of counts of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956).

### B.   Joinder Pursuant to Fed. R. Crim. P. 8

Rule 8(b) permits the Government to "charge 2 or more defendants" in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that 'joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'" United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (quoting United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990)). As evidenced by the use of the disjunctive "or," the satisfaction of either prong is sufficient to support joinder. See, e.g., United States v.

33

Guillen-Rivas, 950 F. Supp. 2d 446, 454 (E.D.N.Y. 2007) (membership in the same conspiracy or related conspiracies constitute participation in 'a common scheme or plan'); United States v. Aronson, No. 98 Cr. 564 (DAB), 1999 WL 97923, at *3 (S.D.N.Y. Feb. 24, 1999) (finding joinder was proper where the charges shared a substantial identity of facts and participants). Courts in this Circuit apply "a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either . . . of the defendants resulting from the joinder." Rittweger, 524 F.3d at 177 (internal quotation marks omitted).

Joinder is presumptively appropriate where defendants are charged with participating in a single conspiracy. See, e.g., United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."). Rule 8(b) also permits the joinder of defendants charged in distinct conspiracies so long as those defendants share either a substantial identity of facts or participants, or a common plan or scheme. See, e.g., United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (joinder appropriate where there were two groups of defendants charged with separate conspiracies with only one defendant in common to both conspiracies because the transactions alleged in both were part of a series of acts that shared a common purpose of concealing and laundering the income of the common defendant).

### C.    Law Regarding Conspiracy

"A single conspiracy may encompass members who neither know one another's identities . . . nor specifically know of one another's involvement." United States v. Sureff,

15 F.3d 225, 230 (2d Cir. 1994) (citations omitted); see also United States v. Labat, 905 F.2d 18, 21 (2d Cir. 1990) ("The defendant need not know the identities of all of the other conspirators, nor all of the details of the conspiracy."). The government may prove that multiple defendants are part of the same, unified conspiracy by showing that "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." Sureff, 15 F.3d at 229-30 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)). "A single conspiracy may be found where there is 'mutual dependence and assistance' among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the 'success of the venture.'" United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989) (alterations in original) (quoting United States v. Bertolotti, 529 F2.2d 149, 154 (2d Cir. 1975)). Additionally, a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." United States v. Berger, 224 F.3d 107, 114-15 (2d Cir. 2000) (quoting Maldonado-Rivera, 922 F.2d at 963).

In a "hub-and-spoke" or "wheel" conspiracy specifically, "members of a 'core group' deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." United States v. Manarite, 448 F.3d 583, 589 (2d Cir. 1971); See also United States v. Taggert, No. 09-CR-984 (BSJ), 2010 WL 532530, at *1-2 (S.D.N.Y. Feb. 11, 2010 (describing wheel conspiracies). In such cases, "[t]o prove a single conspiracy, . . . the Government must show that there was a 'rim' around

the spokes, such that the 'spokes' became coconspirators with each other." United States v. Pauling, 256 F. Supp.3d 329, 335 (S.D.N.Y. 2017), aff'd and remanded, 924 F.3d 649 (2d Cir. 2019). The "spoke" participants may be found members of a single conspiracy along with the "hub" conspirators as long as the spoke participants "knew or had reason to know of the existence . . . of one or more of the other spoke participants." Manarite, 448 F.2d at 589; see also Taggert, 2010 WL 532530, at *1 ("While [the two spoke participants] may have been unaware of each other's identity, they could not have been unaware that the other existed. That is all that a wheel conspiracy requires.").

Finally, when an indictment charges multiple parties in a single conspiracy, "the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." United States v. Rajaratnam, 736 F. Supp.2d 683, 688 (S.D.N.Y. 2010); see United States v. Aracri, 968 F.2d 1512, 1519 (2d Cir. 1992) ("Whether the government has proved a single conspiracy or instead has proved 'multiple other independent conspiracies is a question of fact for a properly instructed jury.'").

## II.   Discussion

### A.   The Indictment Is Not Duplicitous

The defendants contend that Counts One, Five and Six are duplicitous and should either be dismissed or, in the alternative, severed. See Joint Def. Mem. at 8-16. Specifically, the defendants assert that there are two distinct groups of defendants: those that work for Tronix and those that work for National. As such, the defendants contend that the government alleges multiple conspiracies under the guise of one (Count One). Defendants A. Khwaja and Rhamatzada further claim that this duplicity infects the other counts that group

36

the National defendants with the Tronix defendants (Counts Five and Six), and unfairly prejudices them. See Joint Def. Mem. at 8-16. The defendants are wrong.

Defendants claim that there is no evidence that the Khwaja Companies "have any connection with each other[,] have ever coordinated or communicated with each other[,] have ever agreed about anything or ever mutually benefitted one another[,] or have any business relationship with each other" as if that would preclude the defendants from being coconspirators with, or structuring on behalf of, the Farhat MLO. See Joint Def. Mem. at 8; see also id. at 10-16. That is not correct and, even if it were, it would not provide a basis for dismissal.

As an initial matter, contrary to the defendants' arguments, Counts One, Five and Six do not charge separate schemes. Count One charges a single conspiracy: that is, the Khwaja Companies, together with the Farhat MLO, conspired to launder money on behalf of international narcotics traffickers. Similarly, the structuring count, Count Five, reflects conduct engaged in by defendants employed by both the National Companies and the Tronix Companies, a distinction without any legal difference insofar as Counts One and Five are concerned. The structuring, like the money laundering, was done to further the conspiracy.

As the Indictment alleges, and the government will prove at trial, the defendants, together with the Farhat MLO, conspired to launder money on behalf of international narcotics traffickers, and each defendant took substantive criminal steps in furtherance of that goal and purpose. Further, the defendants had "reason to know of the existence of the other spoke

37

participants." <u>Manarite</u>, 448 F.2d at 589.[11]  There are not two distinct groups of companies operating separately and distinct; rather, the defendants – through their ownership of, or employment with, the Khwaja Companies – are intertwined in their conspiracy with the Farhat MLO.  There is no question that the Farhat MLO forms the "hub of the wheel" in this case, and the government will prove at trial that the defendants were well aware of each's "part in a larger organization where others performed similar roles equally important to the success of the venture." <u>Vanwort</u>, 887 F.2d at 383.

All the Khwaja Companies are engaged in the same scheme and the same conspiracy, which overarching purpose is to launder money for drug traffickers and money launderers in Mexico and South America and conceal that laundering.  The Khwaja Companies not only accepted bags of cash in parking lots (<u>e.g.</u>, E. Khwaja's conduct) and structure the cash into bank accounts, but the companies also accept deposits denominated as drug proceeds from undercover officers operating undercover companies (<u>e.g.</u>, A. Khwaja's and E. Khwaja's conduct) and try to mask the source of that cash.  In addition, the Khwaja Companies both (E. Khwaja and A. Khwaja companies) accepted millions of dollars from the same third parties with whom they did no business, another feature of TBML.

In fact, from approximately January 2014 to October 2018, in total, there were approximately 51 separate third-party companies that sent money (wires and/or checks) to both ISK (an A. Khwaja company) and Tronix (an E. Khwaja company).  This amounted to a total

---

[11]  According to records, E. Khwaja's father and brother are partial owners of National and received a share of the profits from National, an A. Khwaja company.  <u>See</u> Affidavit 1 at ¶ 6.

of $61,819,544.28: A. Khwaja's company ISK received approximately $42,172,673.53, and E. Khwaja's company Tronix received $19,646,870.75.   None of these 51 third-party companies did any business with the Khwaja Companies.   Rather, ISK and Tronix both received millions of dollars from nominee companies located throughout the United States and in South America.   Notably, this time period closely tracks the time period of the conspiracy set forth in the Indictment.   <u>See</u> Ind. at ¶¶ 14-15, 22-23.

In addition, even a limited government review of select transactions of two of the Khwaja Companies – E. Khwaja's company, Tronix, and A. Khwaja's company, ISK – found indicators of a TBML scheme at both companies.   <u>See</u> Exhibit A, Szwalek SW Aff., at ¶ 20.   The indicators included payments made by third parties with no connection to the business, internal layering and ISK's failure to reconcile invoices with payments as well as a trade discrepancy.   <u>Id</u>. at ¶¶ 25-26.

Moreover, all Khwaja Companies engaged in structuring.   Not only did Tronix and National both keep deposits under ten thousand dollars to evade the currency reporting requirements – which is illegal within itself – Tronix and National both structured the illicit proceeds directly into their accounts.   Notably, the Khwaja Companies are intertwined as they share the same accountant, defendant Rahimi, which is a common feature and natural consequence of a joint money laundering operation.   <u>See</u> Affidavit 1 at ¶ 4.

Even if the defendants' assertion that "there is no evidence" linking each to the conduct of certain other defendants charged in the conspiracy were accurate – which it is not – the "sufficiency of the evidence is not appropriately addressed on a pre-trial motion." <u>Alfonso</u>, 143 F.3d at 776-77.   "Whether the government has proved a single conspiracy or has

39

instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury." Acacri, 968 F.2d at 1519.  The defendants' argument on this point must be saved for trial.  It is not an appropriate basis for dismissal.

**B.**   **Defendants' Request to Sever Certain Counts Should Be Denied**

Moreover, defendants A. Khwaja, Rhamatzada and Rahimi's request for severance of certain claims based on contention that the conduct of the "Tronix defendants" unfairly prejudice the "National defendants" is equally without merit.  See Rahimi Mem. at 4-8 (requesting to sever Counts One, Five and Six from Counts Two, Three and Four).  Defendants' suggestion that there is "especially acute" prejudice to A. Khwaja (and the "National defendants") from the evidence of E. Khwaja (a "Tronix defendant") taking bulk cash drops in hotel parking lots (Joint Def. Mem. at 13) when A. Khwaja is occupied accepting deposits from undercover agents posing as drug traffickers has no merit.  The proof against E. Khwaja in no way "dwarfs" the proof against A. Khwaja and the proof against E. Khwaja is no "more sensational" (Id. at 19-20) than the evidence demonstrating the pattern of acceptance of drug traffickers' monies by A. Khwaja and his acceptance of structured postal money orders.

Even if there was a disparity of proof – for which the government contends there is not – a case cited by the defendants makes it clear that disparity of proof, standing alone, is insufficient to justify severance.  See United States v. McCabe, No. 05-CR-237 (DRH), 2006 WL 2990480 (E.D.N.Y. 2006).  In McCabe, the only relief given was to sever one count from the other counts because the only connection between that count and the other counts was an identical defendant.  That holding is inapplicable here where the defendants are engaged in a

conspiracy together to serve the Farhat MLO.  Contrary to defendants' claim, as discussed above, there is a common plan and purpose here.

Accordingly, the defendants' requests for dismissal or to sever certain counts of the Indictment should be denied in their entirety.

## POINT II

### DEFENDANTS' MOTIONS
### FOR SEVERANCE SHOULD BE DENIED

Similarly, the defendants' motions to sever, pursuant to Fed. R. Crim. P. 8(b) and/or Fed. R. Crim. P. 14, on the grounds that they are improperly joined because the offenses alleged do not rise out of a common plan or scheme, nor do they involve the substantial identity of fact or participants (see Joint Def. Mem. at 16-21.  See also Rahimi Mem. at 4-8; Bokhari Aff. at 2-3; E. Khwaja Mem. at 3-5; Saenz Mem. at 1, 4-5), should be denied.

## I.   Applicable Law[12]

The federal criminal justice system has a strong policy in favor of joint trials of defendants who are indicted together.  See, e.g., Zafiro v. United States, 506 U.S. 534, 537 (1993).  It is well-settled that joint trials under Rule 8 of the Federal Rules of Criminal Procedure promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  Zafiro, 506 U.S. at 537 (citations omitted).  Joint trials also eliminate the random unfairness of the last-tried defendants having "the advantage of knowing the prosecution's case beforehand."  Richardson v. Marsh, 481 U.S. 200, 210 (1987).  In addition, joint trials promote efficiency by obviating the need for the government to "present

---

[12] For the law on joinder, pursuant to Fed. R. Crim. P. 8, see Point I, Applicable Law, Subsection B, supra, at pp. 33-34.

[] the same evidence again and again," before a court that has already heard it all before or to call "victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." Id. These factors explain why joint trials "play a vital role in the criminal justice system." Zafiro, 506 U.S. at 537 (quotation marks omitted).

Where, as here, defendants have been properly charged together in a single indictment pursuant to Rule 8, there is a strong presumption favoring trying the defendants together. Fed. R. Crim. P. 8; United States v. Ramos, 346 F. Supp. 2d 567, 569 (S.D.N.Y. 2004) citing United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) ("The principles that guide [a] district court's consideration of a motion for severance usually counsel denial."). The presumption is even stronger when "the crime charged involves a common scheme or plan." Ramos, 346 F. Supp. 2d at 569 citing Turoff, 853 F.2d at 1042-43.

The Supreme Court has instructed district courts to grant a severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539; see also United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993). Importantly, "[e]ven if prejudice is shown . . . severance is not necessarily required" under Rule 14. United States v. Diaz, 176 F.3d 52, 104 (2d Cir. 1999). That is because, "even when the risk of prejudice is high, measures less drastic than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" Id. (quoting Zafiro, 506 U.S. at 539). Severance is not warranted unless the denial of such relief would so severely prejudice a defendant such that he could not obtain a constitutionally fair trial. See, e.g., United States v. Locascio, 6 F. 3d 924, 947 (2d Cir. 1993); United States v. Lasanta, 978 F.2d 1300,

42

1306 (2d Cir. 1992).   Indeed, a "defendant raising a claim of prejudicial spillover bears an extremely high burden." Nerlinger, 862 F.2d at 974; see also United States v. Amato, 15 F.3d 230, 237 (2d Cir. 1994) ("Given the balance struck by Rule 8, which authorizes some prejudice against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice.") (internal quotations and citations omitted).   To carry this burden, a defendant "must, at the threshold, articulate specific instances of 'legally cognizable prejudice.'" Harwood, 998 F.2d at 95.

### A.   The Defendants Are Properly Joined Under Fed. R. Crim. P. 8

The defendants' arguments fail for the same reasons that the defendants' arguments for dismissal or to sever certain counts fail.   Namely, that the defendants ignore the evidence (largely outlined in the various search warrant and wiretap affidavits), and rely on facts that are neither grounded in the Indictment or reality.

As discussed in detail above, and as alleged in the Indictment, there is a single overarching conspiracy in this case:   to launder money for drug traffickers and money launderers in Mexico and South America and conceal that laundering.   The defendants' ownership, operation and/or employment by the various Khwaja Companies is in furtherance of the same fraudulent criminal scheme and conspiracy.   Indeed, the Khwaja Companies employ the same accountant – defendant Rahimi – a common feature and natural consequence of a joint money laundering operation.   See Affidavit 1 at ¶ 4.

As also discussed above (see pgs. 38-39), the Khwaja Companies accept drug trafficking proceeds, engage in structuring and accept third party funds who the companies otherwise have no business with.

Furthermore, both E. Khwaja's company, Tronix, and A. Khwaja's company, ISK, conducted business with convicted defendant Mahmoud Barakat, who was also charged in the same conspiracy as Farhat, as a result, in part, of their money laundering activity with these same third-party companies.   Additionally, both ISK and Tronix did business with defendant Farhat through some of these same third parties.   See Affidavit 1 at ¶ 3.

Indeed, from approximately January 2014 through October 2018, E. Khwaja's and A. Khwaja's companies (Tronix and ISK) both received large amounts of funds from nominee individuals located throughout the United States and South America.  The Khwaja Companies, owned by both A. Khwaja and E. Khwaja, received tens of millions of dollars from entities with no identifiable business relationship with them.  See Exhibit A, Szwalek SW Aff. at ¶ 16; Exhibit B, Szwalek Wire App., at ¶ 15.

For this, the defendants are properly charged in Count One with participating in a conspiracy to commit money laundering and in Counts Two through Six with related substantive offenses.  These charges, standing on their own, are enough to join the defendants. See Nerlinger, 862 F.2d at 973 ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)").

Even assuming arguendo that the defendants' assertions are accurate and the Indictment describes two parallel money laundering conspiracies, the defendants are still properly joined, as the defendants was aware of the other's actions and are unified by a substantial identity of facts and overlap of participants.

### B.      The Defendants Are Properly Joined Under Fed. R. Crim. P. 14

As with their motion to sever certain counts as an alternative to dismissal, defendants A. Khwaja, Rhamatzada and Rahimi, likewise, each seek to sever their trials under Rule 14.  The defendants base their motion for severance on the grounds that the "National defendants" will suffer prejudice because the jury will hear evidence about the criminal acts of their Tronix co-defendants" and the jury may hold that evidence against them.  See Joint Def. Mem. at 17-20; Rahimi Mem. at 4-8.  This application is, equally, without merit.

The defendants are charged in the same TBML conspiracy and their respective criminal conduct is inextricably interwoven with that of their codefendants.  The substantive counts are mere examples of the criminal conduct each respective defendant took in furtherance of the overall TBML conspiracy scheme.

In order to overcome the aforementioned strong preference for joint trials, the defendants must set forth a specific trial right that would be compromised or demonstrate that the jury would be prevented from making a reliable judgment about each defendant's respective guilt.  Each defendant has failed to do that.  Instead, the "National defendants" make the conclusory claims that they may be convicted simply because of the evidence of criminal conduct of the "Tronix defendants."  Aside from being baseless, such rank speculation is insufficient to overcome the strong preference for a joint trial.

Moreover, even if there were more evidence against one defendant as opposed to another, such disparity would, likewise, be of no moment.  The relevant inquiry is whether joinder with co-defendants would compromise a specific trial right or prevent a jury from

making a reliable judgment about each defendant's guilty.  None of the defendants have shown otherwise.

In the event that there were separate trials, the government would have to call many of the same witnesses to give virtually the same testimony.  For example, the government would be required to call the same cooperating witnesses, HSI agents, and reintroduce thousands of pages of the same documentary evidence.  See Richardson, 481 U.S. at 210 (stating that the need for witnesses to testify multiple times favors trying to join co-defendants together).  Under these circumstances, severance would be extremely burdensome and would necessarily disadvantage the public, the Court, and the government with repetitive trials.

Finally, any perceived prejudice to a defendant could easily be rectified with appropriate limiting instructions from the Court.  It is well-established that a jury is presumed to follow a trial court's instruction.  See, e.g., Richardson, 481 U.S. at 211; United States v. Pforzheimer, 826 F.2d 200, 205 (2d Cir. 1987).  The standard Sand jury instruction regarding "Multiple Counts – Multiple Defendants" would accurately instruct the jury and prevent any improper consideration.  See Sand, Modern Federal Jury Instructions, § 3-8.

None of the defendants meet the high standard for trial severance based on this supposed, speculative prejudice.  Because the defendants are charged in the same conspiracy, because their conduct arose of the same criminal acts, and because the facts and participants substantially overlap, they are properly joined and their motions to sever must be denied.  And, for the same reasons set forth above in Point I, the defendants' motion should be denied.

## POINT III

### NO EVIDENCE SEIZED FROM
### THE WIRETAPS OR SEARCH WARRANTS
### SHOULD BE SUPPRESSED

Defendants request suppression of evidence obtained from the wiretaps and the search warrants or, in the alternative, for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), to determine whether the Court should suppress all evidence obtained from both the wiretaps of the various phones and the search warrants.  See Joint Def. Mem. at 21-44; see also Rahimi Mem. at 8-22; E. Khwaja Mem. at 5-14; and Saenz Mem. at 1, 11-12.  Defendants claim (i) there was a lack of probable cause, (ii) that omissions tainted the wiretap and warrant applications, (iii) that the warrants were overbroad and not particular enough and (iv) that the government failed to promptly search the seized materials, in fact "sat on its hands" for months after seizure and waited ten months to begin searching devices (Joint Def. Mem. at 21-22, 30). The defendants' suppression motions should be denied.

I.   **Applicable Law**

   A.   **Probable Cause for Wiretaps and Search Warrants**

The standard for probable cause applicable to a wiretap is the same as that for a regular search warrant.  United States v. Fury, 554 F.2d 522, 530 (2d Cir. 1977).  Probable cause to authorize a wiretap "is established if the 'totality of circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance." United States v. Ambrosio, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (quoting United States v. Rowell, 903 F.2d 899 (2d Cir. 1990)).  Probable cause exists if the facts in the supporting affidavit are "sufficient to warrant

47

a prudent man in believing" that evidence of a crime would be disclosed through the proposed wire surveillance.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  "Substantial deference is afforded the issuing judicial officer's determination of probable cause . . . and doubts . . . must be resolved in favor of the prior judicial authorization."  United States v. Gotti, 42 F. Supp. 2d 252, 261-62 (S.D.N.Y. 1999).  Put another way, "the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'"  Id. (citation omitted).  "Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization."  Ambrosio, 898 F. Supp. at 181.

Furthermore, when a probable cause determination is under review, the affidavit supporting the application for electronic surveillance must be construed in a realistic and common-sense manner.  See United States v. Harris, 403 U.S. 573, 577 (1971); United States v. Bellomo, 954 F. Supp. 630, 636 (S.D.N.Y. 1997).  The Second Circuit has cautioned against reading probable cause affidavits with "microscopic intensity."  United States v. Pond, 523 F.2d 210, 214 (2d Cir. 1975).

"When reviewing the legality of previously issued search warrants, reviewing courts "accord 'great deference' to a judge's determination that probable cause exists, and . . . resolve any doubt about the existence of probable cause in favor of upholding the warrant." United States v. Salameh, 152 F.3d 88, 112–13 (2d Cir. 1998) (quoting United States v. Leon, 468 U.S. 897, 914 (1984)).  The reviewing court's duty is "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238 (1983).  "Courts must refrain from invalidating judicially authorized warrants based on 'hypertechincal' interpretations of affidavits."  United States v. Williams, No. 13-CR-419

48

(DLI), 2016 WL 4257346, at *3 (E.D.N.Y. Aug. 11, 2016) (quoting United States v. Ventresca, 380, U.S. 102, 107 (1965)).  "[W]here the circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the resolution of doubtful or marginal cases . . . should largely be determined by the preference to be accorded to warrants."  Ventresca, 380 U.S. at 109.  The movant bears a "heavy burden" when challenging a warrant for lack of probable cause.  Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.  When making a determination regarding probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238.

**B.     The Franks Doctrine**

Where a defendant argues that an affidavit in support of a search warrant or wiretap order contained deliberately misleading or recklessly false information, a hearing can be held to test the accuracy of those claims under Franks in certain limited circumstances.  To be entitled to such a hearing, "a defendant must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998)

(internal quotation marks omitted); see also United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008); United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) (noting that "in order to invoke Franks doctrine, a defendant must show that there were intentional and material misrepresentations or omissions in the warrant affidavit.").  A defendant seeking to make the first required showing of an intentional or reckless misstatement or omission must show more than inadvertent error. "[E]very statement in a written affidavit does not have to be true," United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005), and "the mere intent to exclude information is insufficient . . . [because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly . . . An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Awadallah, 349 F.3d at 67-68 (internal quotation marks omitted).  "To prove reckless disregard for the truth," a defendant must "prove that the affiant in fact entertained serious doubts as to the truth of his allegations." Id. (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).

The burden of proof in showing deliberate falsehood or reckless disregard for the truth rests squarely with the defendant.  The requirement of a substantial preliminary showing is necessary to prevent the misuse of a veracity hearing for purposes of discovery or obstruction.  Id. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine."). In attempting to make such a showing, "the defendant cannot rely on a conclusory attack, but must instead make specific allegations, accompanied by an offer of proof such as affidavits or otherwise reliable witness statements." Scala, 388 F. Supp.2d at 405 (citing Franks, 438 U.S.

at 171-72); see United States v. Labate, 2001 WL 533714, at *17 (S.D.N.Y. May 18, 2001) (holding that any allegations of falsity must make a "substantial preliminary showing" that is "'accompanied by an offer of proof . . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence explained'") (quoting Franks, 438 U.S. at 171).

Where a defendant fails to support the factual allegations of a motion to suppress with an affidavit from a witness with personal knowledge, the defendants have not made the preliminary showing required to advance their motion to a stage where a suppression hearing is warranted.  See United States v. Sacco, 563 F.2d 552, 558 (2d Cir. 1977); United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967); United States v. Ortiz, 499 F. Supp.2d 224, 229 (E.D.N.Y. 2007) (Irizarry, J.) (denying motion for Franks hearing where defendant merely made "bald, conclusory allegations that the court was misled").  A defendant's burden is met and a trial court must grant a hearing only when the movant's affidavit contains specific factual allegations which, if proven at a hearing, would require granting the relief requested. United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969).  Here, the only affidavit filed in support of the motion to suppress documents seized under the search warrants is from a defense counsel who attaches documents which is insufficient to trigger a hearing.

Indeed, courts routinely require that specific allegations in support of a suppression motion be based on personal knowledge.  See, e.g., United States v. Larranga-Lopez, 2006 WL 1307963, *3 (E.D.N.Y. May 11, 2006) (Townes, J.) ("Courts in this district have repeatedly denied hearings where defendants have failed to provide affidavits alleging facts based on personal knowledge."); United States v. Simpkins, 1996 WL 629567 (E.D.N.Y.

51

Oct. 16, 1996) (Nickerson, J.) (suppression motion denied because "defendant has failed to provide an affidavit based on her own personal knowledge"); United States v. Clement, 1995 WL 151786 (E.D.N.Y. Mar. 29, 1995) (Johnson, J.) (affidavit in support of suppression motion is "insufficient if it is not based on personal knowledge"); United States v. Brumby, 1992 WL 373686 (E.D.N.Y. Nov. 30, 1992) (Hurley, J.) (defendant's "failure to submit an affidavit based on personal knowledge bars his application for a hearing on these suppression issues"), aff'd, 23 F.3d 47 (2d Cir. 1994).

Here, as set forth below and in the Statement of Facts, the defendants' argument that the Szwalek Wiretap Affidavits, the Szwalek SW Affidavit and the Nunez SW Affidavit, respectively, did not provide probable cause to wiretap certain phones or search the Khwaja Companies or certain homes for business records relative to their structuring and money laundering activities is wholly without merit, and they are not entitled to a Franks hearing as no preliminary showing of a deliberate falsehood has been provided.

## II.    The Wiretaps

### A.    The Wiretap Applications Set Forth Probable Cause

The wiretap application set forth probable cause to believe that the targets were engaged in a money laundering conspiracy.  Defendants move for a Franks hearing to determine whether the fruits of the Wiretap should be suppressed because the Wiretap Affidavit wrongly "implied a connection between the Tronix Companies and the National Companies" (Joint Def. Mem. at 27, 36-43; E. Khwaja Mem. at 13).  In fact, there are a host of connections between the Tronix Companies and the National Companies outlined in the wiretap application which is why the companies are properly referenced as the Khwaja

Companies.  Most significantly, the companies are all involved in the Farhat money laundering conspiracy.  See Pages 7-8; 38-39; 43-44 supra.

Further, the second omission claim that defendants make is that the wiretap application "relied heavily on allegations concerning the CBP regulatory audit of ISK" but failed to mention that ISK "passed the audit with only a few areas that the agency identified as requiring improved bookkeeping."  See Joint Def. Mem. at 42.  First, the contention that CBP had no concerns about money laundering is not true. Second, CBP did not do an audit, and based on merely a spot evaluation sampling, CBP specifically identified indicia of TBML practices.  The statement in the wiretap application is accurate.  What defendants suggest should have been added is not true.  There was no audit and ISK did not "pass" the spot evaluation but, rather, received a warning for all its deficiencies and TBML indicators.  See Affidavit 1 at ¶¶ 56-58.

The Szwalek Wiretap Affidavit was more than sufficient to meet the Supreme Court's requirement of a showing of "a fair probability that contraband or evidence of a crime will be found" in the premises to be searched.  Gates, 462 U.S. 213, 238 (1983).  Specifically, the Szwalek Wiretap Affidavit presented facts indicating that defendants were operating companies on behalf of the Farhat MLO.  Text messages involving Rhamatzada evidenced the laundering of proceeds and the structuring of them. (Exhibit B, Szwalek August Wire Aff. at ¶¶ 62-75.)  Both E. Khwaja companies and A. Khwaja companies were accepting drug trafficking proceeds into their companies and then sending phones to South America.  Both companies were also accepting millions of dollars from third party companies and individuals with whom they had no business. Defendants concealed their activities thru crimes of

53

structuring and the false recording of financial transactions in their books and records.  See pgs. 7-8; 38-39; 43-44 supra.  The proof of structuring provided overwhelming evidence that five defendants, all remaining defendants except Saenz, were involved in systemic fraud and a pattern of evasion in how they recorded their corporate financial transactions under $10,000. See Ex. B, Szwalek Wire Aff., at ¶¶ 52-73.

Judges Bianco, Spatt and Seybert found probable cause to issue each wiretap order as it was presented to them during the seven-month period.  The addition of each new phone was a product of probable cause developed to demonstrate their involvement in the conspiracy.

Defendants complain specifically about the Rahimi and Rhamatazada intercepts, both authorized by Judge Bianco.  Judge Bianco properly found probable cause for both the Rahimi wire intercept on January 29, 2018 and the Rhamatzada wire intercept on August 30, 2017.  The affidavits in support of those wiretaps, part of Exhibit B hereto, had separate sections demonstrating the probable cause for each.  For Rhamatzada, the texts and WhatsApp messages she was involved in amply demonstrated her participation in orchestrating structuring for the money laundering operation and masking receipts from South Americans, both in furtherance of the money laundering conspiracy.  See Ex. B, Szwalek August 2017 Wire Aff., at ¶¶ 70-85.  As for Rahimi, Judge Bianco reviewed the affidavit, which recounted Rahimi's involvement in calls that not only demonstrated her involvement in the money laundering conspiracy but also in creating phony records to conceal facts as part of the conspiracy and other crimes.  See Ex. B, Szwalek January 2018 Wire Aff. at ¶¶ 36-42.

Defendant Rahimi claims concerning the probable cause for the wiretap of Rahimi that, regarding the use of a certain phone (Rahimi Mem. at 15), "On the facts provided, it is equally plausible that during the intervening time between her passport application and the affidavit, that someone other than Rahimi was using the phone, that she no longer worked as the bookkeeper for Ishan, and that even if she was the person who made all of the reference communications, that they were nothing more than frequent contact among siblings who live down the street from each other." What defense counsel left out in this analysis was a call between E. Khwaja and Rahimi.  Significantly, on January 17, 2018, E. Khwaja received a call (Session No. 1478) on the E. Khwaja phone from Rahimi on the phone in issue.  E. Khwaja and Rahimi held a conversation in Dari, which lasted for approximately five minutes and thirty-four seconds.  See Ex. B., Szwalek January 2018 Wire Aff., at ¶ 41.  The phone call was as follows:

| | |
|---|---|
| E. KHWAJA: | Uh, did you finish the accounting of the thing or it is not yet clear. |
| RAHIMI: | Well to the accountant. I sent all the accountings to the accountant. I sent all the banks and things like that. Now at the end of the year we have about 550,000 income from Tronix. |
| E. KHWAJA: | Yeah. |
| RAHIMI: | Should we show the whole thing or should we reduce it. Last year as you know, our profit was 180,000. |
| E. KHWAJA: | Yes. |
| RAHIMI: | And the year before that, it was 150,000. |
| E. KHWAJA: | Okay. |
| RAHIMI: | Whether to keep it like that or raise it, I haven't sent it all to Amir yet. |
| E. KHWAJA: | Are you talking about the official? |
| RAHIMI: | Yeah, *the official and the internal one,* we can show it less, in that case, we will have two accounts, otherwise the official one will be as it |

55

is.

E. KHWAJA:   Uhm soon or later we have to show it right?

RAHIMI:   Yes soon or later we have to show. Because they come through the wire right.

E. KHWAJA:   Yes we have to show, but it will show, but it will show like the past two years.

RAHIMI:   Well, you can think that our gross sales are the same as the 3rd year, which was 1.3 because of that our taxes will be a little too much, because of the consolidate, that added to [U/I] right?

E. KHWAJA:   Yes

RAHIMI:   Uhm approximately it should be about 170,000 until the end of the year.

E. KHWAJA:   In my opinion we will show all the expenses, and it will be ok.

RAHIMI:   Okay, I am working on it, it takes time for the banks papers to be done and just send the final number, that is when we finalize and then we'll forward it to him.

E. KHWAJA:   You think, it will be 190?

RAHIMI:   Perhaps, 170. Last year it was 180,000, no 178,000 approximately.

E. KHWAJA:   Yeah.

RAHIMI:   Our income is the same, only our prices have gone up and our profit is 22 percent all together.

E. KHWAJA:   Alright.

RAHIMI:   I am preparing everything.

E. KHWAJA:   Okay. Let's see what happens.

The affidavit continued as follows; "Based on my training, experience, and prior interceptions, I believe in the preceding conversation, E. Khwaja and Rahimi discussed altering the books and the records kept on the expenses for the Tronix business in Saudi Arabia. Rahimi informed E. Khwaja that they can show different the profits made differently with the internal books and records than the ones given with the official statements to the accountant. E. Khwaja also asked Rahimi if they have to "show it right?"

56

Rahimi responded to E. Khwaja that "Yes soon or later we have to show. Because they come through the wire right." Since all wires are documented through bank records, this leaves a paper trail and the profits made from those wires have to be reported. E. Khwaja and Rahimi also discussed coming up with a profit number rather than the actual profit of the company. I believe Rahimi and E. Khwaja are altering the books and records of their businesses in order to facilitate their trade-based money laundering scheme." There were other examples provided in the affidavit regarding the falsification of books records, such as session 212 of the wire interceptions for the cellular telephone of E. Khwaja which, as shown above, calls often focused on the trade-based money laundering scheme run by the Khwaja family.

### B.   Minimization of Calls Was Properly Done

Defendants claim that the government failed in its Minimization Duty (Joint Def. Mem. at 43-44).   That is not true.   As set forth above, the government satisfied its minimization duties, through its plan (see Ex. B at ¶¶ 122-125) of execution for the wire and operation.   United States v. Goffer, 756 F.Supp.2d 588, 595 (S.D.N.Y. 2011).   Indeed, the government minimized about a thousand calls during the intercept period of eight months. Over the eight months, many agents worked on the wiretaps including SA Szwalek.   There were 1,290 pertinent calls, 3,143 non-pertinent calls and 140 privileged calls which were marked as such by the monitors/translators and never heard by any agent.   See Affidavit 1 at ¶ 14.   Of the 4,373 calls that were monitored, there were a total of 3,319 calls that were two minutes or less.   Instructions including minimization instructions were provided by an Assistant United States Attorney.   Agents on the wiretap were required to read and sign those instructions before working on the wiretap.   Id. at ¶ 11.

57

Examples of minimization include the following:  For example, Session 292 for the interception of the cellular telephone of Rhamatzada, a call on September 16, 2017 that was in English, the monitor minimized the phone call as it was deemed unrelated to the instant offenses.  Again, later that same day, Session 300 involved the interception of a call on Rhamatzada's cell phone in English, and, again, that call was identified as non-pertinent and minimized.

Even the few calls defendants complain about were properly handled. Defendant complains about a failure to minimize a call (Joint Def. Mem. at 43) on October 21, 2017, between Rhamatzada and Abdul, Session 1311 in Dari, which was related to a previous session earlier that day Session 1298. The call initially started about money, SHIKEBA: Uhhh. the check is fine. Money is in the account. ABDUL: That is fine. I did not say anything." This conversation then starts switching topics over to a pilgrimage and "Haj." Once the monitor determined that the conversation was not related to the instant offenses, the call was minimized and spot checked where the Monitor determined the possible dates of the trip and who was going, all relevant to the investigation. Based on this evidence, agents could determine if they wanted to conduct a border search on the return trip and the risks involved if all family members were traveling, and also take into account for future wiretap applications if the family was going to be for overseas for an extended periods of time. There are many more examples of where calls were minimized, spot-checked and deemed non-pertinent.

**C.      The Wiretap Established "Necessity"**

Defendants further contend that the Wiretap Application failed to establish necessity.  (Joint Def. Mem. at 42-43; Rahimi Mem. at 15)  Because, as set forth below, the

application exhaustively discussed each of the investigative techniques used, attempted or contemplated by the government during its investigation, the defendant's contention is without merit.

The law requires that, before authorizing the interception of electronic communications, other investigative measures must reasonably appear to be unlikely to succeed, be too dangerous, or have been tried and failed.  See 18 U.S.C. § 2518(1)(c) and (3)(c); United States v. Giordano, 416 U.S. 505, 515 (1974); United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  Such a requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  Kahn, 415 U.S. at 153 n.12.  A wiretap application must provide a practical basis for concluding that other investigative techniques are not feasible.  See United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983) (citing S. Rep. No. 1097, 90th Congress, 2d Sess. 101).

Although the defendant, and some courts, refer to Section 2518(3)(c) as the "necessity requirement," that term is a misnomer because the statute does not require that a wiretap be the exclusive avenue to conduct an investigation.  Instead, as the Second Circuit has explained:

> [T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir. 1979)), abrogated on other grounds, see United States v. Marcus,

628 F.3d 36, 41-43 (2d Cir. 2010); see also United States v. Hogan, 122 F. Supp.2d 358, 361 (E.D.N.Y. 2000) ("[t]he purpose of section 2518 is merely to 'require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement.'") (quoting United States v. Hinton, 543 F.2d 1002, 1011 (2d Cir. 1976)).

The Second Circuit has further held that the statute does not require "'that any particular investigative procedure be exhausted before a wiretap be authorized.'" United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)). Furthermore, "[i]t is not a requirement of [Section 2518] that ordinary investigative techniques be exhausted before such interceptions may be authorized." United States v. Aparo, 221 F. Supp. 2d 359, 370 (E.D.N.Y. 2002) (Glasser, J.) (citing United States v. Martino, 664 F.2d 860, 868 (2d Cir. 1981)); see also Hogan, 122 F. Supp.2d at 361 (Platt, J.) (citing United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999)). At most, the government must demonstrate only that normal investigative techniques would prove difficult in exposing the full extent of the criminal activity, not that they would be doomed to failure. See United States v. Scala, 388 F. Supp.2d 396, 404 (S.D.N.Y. 2005). Necessity is required as to the target of a wiretap which, as here, may be a conspiracy but there is no requirement to demonstrate necessity as to each additional interceptee or phone only probable cause. U.S. v. Carillo, 123 F.Supp.2d 1223 (D. Colo. 2000); U.S. v. Ford, 183 F. Supp.3d 22, 29 (D.D.C. 2016)("In the conspiracy context, the necessity requirement is satisfied when traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope" quoting United States v. Scurry, 821 F.3d 1 (D.C. Cir. 2016)).

60

### 1.      Confidential Informants

As indicated in the Wiretap Application, the government used confidential informants during the course of the investigation but "the confidential sources would not be in a high enough position in Farhat's money laundering organization to enable law enforcement to understand the full scope of the criminal activity of the organization." (See Ex. B, Szwalek Wire App., at ¶ 99.)  The affidavit went on to explain that further attempts to infiltrate the organization "could place the undercover agents and the informant in danger." Id. at ¶ 100. Caselaw recognizes these limits. United States v. Hogan, 122 F. Supp. 2d 358, 365 ("The affiant also explained why traditional investigative techniques would not be successful in achieving the goals of the investigation, which were not merely the apprehension of the defendant, but the gathering of evidence beyond a reasonable doubt about his entire narcotics operation, including his suppliers, customers and subordinates.").   Accordingly, the confidential informant could not be used further for any target interceptee as the person could not make further inroads into the conspiracy.  This aspect of necessity applies to all target interceptees.

### 2.      Other Investigative Techniques

The Wiretap Application further demonstrated that the investigation used other techniques that were insufficient to investigate the conspiracy.  For example, law enforcement officers performed surveillance of the targets and their homes, including placing pole video cameras outside one target's home, but the techniques would not be expected to provide detailed evidence regarding drug trafficking and money laundering (see Ex. B at ¶¶ 105). Thus, a pole camera could not be utilized for any target in the cul-de-sac which included E.

61

Khwaja, Rhamatzada and Rahimi.   The investigation also used border electronic media searches (id. at ¶¶ 105-107) but noted that "further searches may raise suspicions." Id. Defendants suggestion (see Joint .Def. Mem. at 42) that the government concealed from the Court that border searches had been done on E. Khwaja by stating that the government stated, "The paragraph goes on to state that the agents have not done with respect to Nat because of concerns that such a border search would "raise…suspicions." Similarly, this applies to all target interceptees.  As mentioned in previous wiretap applications, agents did mention that border searches were conducted on E. Khwaja and others and were not done at other times for various investigative reasons.  Nothing regarding border searches was concealed.

Before the wiretap applications, the government also used review of phone records, pen registers (id. at ¶¶ 111-112) and financial investigation (id. at ¶¶ 105-106) but all those as well as geolocation and results of narcotics investigations (id. at ¶¶ 108-110) have limited uses and results. Indeed, the surveillance helped to identify when and where targets were meeting, but not the purpose of those meetings or the identities of all of the participants. Electronic surveillance was needed to assist in that endeavor.  Id.

Here, the Wiretap Application amply demonstrated the difficulties and dangers of using a confidential informant, an undercover agent, surveillance and other investigative techniques to uncover the full extent of criminal activity engaged in by the defendant, all the targets and their co-conspirators.  Defendants complain that not every investigative technique was used for every defendant before seeking a wire intercept order.  Nevertheless, necessity was demonstrated as to each target interceptee as discussed above.  In any event, complaints about the necessity showing as to each interceptee are unavailable.  Necessity attaches to the

target, here, the conspiracy, not every additional interceptee or phone.   Accordingly, the Wiretap Application satisfied the necessity requirement.

## III.   <u>The Search Warrants</u>

### A.   <u>Ample Probable Cause Supported the Search Warrants</u>

The law requires the Court to consider the totality of the circumstances to determine whether an affidavit is sufficient to demonstrate probable cause. <u>United States v. Cruz</u>, 785 F.2d 399, 406 (2d Cir. 1986).  Probable cause exists if the warrant application and affidavit describe circumstances showing a fair probability that contraband or evidence of a crime will be found in a particular place and the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. <u>Illinois v. Gates</u>, 462 U.S. 213, 238-239, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasis added). A search warrant issued by a neutral magistrate is "presumed reasonable" because search warrants may issue only upon a showing of probable cause. <u>United States v. Aw</u>adallah, 349 F.3d 42, 64 (2d Cir. 2003).

<u>The June 2018 E-mail Search Warrant</u>

Rahimi challenges the search warrant issued in June 2018 for her email account claiming there was a lack of probable cause.  The probable cause for that search warrant, as detailed in the Statement of Facts, included as to Rahimi email account, (i) Rahimi was involved in the money laundering conspiracy as part of her duties as the accountant for Tronix and Ishan (Rahimi Memo. at 12), (ii) calls showed Rahimi involved in business records manipulation to further the conspiracy (<u>id</u>. at 15-16) and emails are referenced as part of

Rahimi doing business (id. at 18).  Rahimi claims there was no probable cause to believe that the email being searched was used in the business.  Yet, conversations in the search warrant affidavit repeatedly referenced to Rahimi's email and, in a conversation about the payrolls of Tronix and Sysco, E. Khwaja states that Rahimi can answer those questions, just email her at this email address which was the email address that was searched.

<u>The November 2018 Search Warrants</u>

In addition, defendants challenge the November 2018 search warrants executed at three offices in New York and Florida as well as all evidence obtained from the search of the homes of E. Khwaja, A. Khwaja, Rahimi and Rhamatzada in New York.  The seized items include 175 boxes of hard-copy documents and the information obtained from seized computers and servers.   Defendants claim that the warrants were general warrants in that they (1) lacked probable cause[13] based on multiple "misleading" statements or omissions by the agent (Joint Def. Mem. at 21-29); (2) lacked particularity, failed to include a time limit and were overbroad; and (3) the government "sat on its hands" for months after seizure and waiting ten months to begin searching the devices (Joint Def. Mem. at 21-35; Rahimi Mem. at 18-22; E. Khwaja Mem. at 7-8).  None of Defendants' arguments have merit: they do not provide an adequate basis to overcome the substantial deference due the two magistrate judges' findings, the good faith of the agents in both obtaining and executing the warrant and they do not meet the burden necessary to hold an evidentiary hearing.

---

[13]  This claim of lack of probable cause to search the company offices of a defendant who is accused in an indictment attached to the search warrant affidavit of committing financial crimes through that company seems inapt.

64

As for the search warrants for offices and homes, the November 2018 Search Warrants, an overview of the probable cause for them is summarized in the Statement of Facts herein at Pages 15-16.

### B.     There Were No Omissions or Misleading Statements

Defendants also argue that Special Agent John Szwalek omitted information from his affidavit which improperly effected the Judges' probable cause findings.   The facts supplied by the Agent were correct.   No material omissions occurred.   As Franks states, "[a]llegations of negligence or innocent mistake are insufficient."  438 U.S. at 171.

Defendants' main complaint regarding omissions or misleading statements is that Special Agent Szwalek describes the "Khwaja family companies" without distinguishing between National Companies and Tronix Companies improperly arguing for guilt by association of defendants. (Joint Def. Mem. 27-28).   As outlined in the Szwalek SW Aff., Ex. A at ¶¶ 25-46, and the Nunez SW Aff., Ex. C at ¶¶ 16-46, the companies were inextricably linked in their conspiracy with Farhat and Barakat.  The companies were linked together as the Khwaja Companies because there was no difference between the companies in terms of their participation in the Farhat MLO during the term of the conspiracy (2013-2018), their acceptance of millions from third party companies and their acceptance of drug trafficking proceeds. See Ex. A, Szwalek SW Aff., at ¶ 10-53; Ex. C at ¶¶ 17-27.

Where a claim, as here, involves omissions from the affidavit, the standard for establishing materiality to trigger a Franks hearing is even higher:

> [T]o be material under Franks, an omission must do more than potentially affect the probable cause determination: it must be necessary to the finding of probable cause. For an omission to serve as the basis for a hearing under Franks, it must be such that

> its inclusion in the affidavit would defeat probable cause. .
> Omitted information that is potentially relevant but not
> dispositive is not enough to warrant a Franks hearing.

United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (citations and internal quotation marks omitted).  Here, there is nothing other than speculation presented in support of the claim that Special Agent Szwalek intentionally omitted material facts known to him.

Further, defendants' claim that the affidavit's information was stale defeating probable cause has no merit. Certainly, the affidavit was not "woefully stale," as indicated by Rahimi's defense counsel (Rahimi Mem. at 19). Rather the most recent intercepted wire communication between E. Khwaja and Rahimi indicating the falsification of books and records occurred only thirteen (13) days before the approval and signing of the affidavit by the Judge. To determine whether information is too stale the court examines two factors: "the age of the facts and the nature of the conduct alleged to have violated the law."  United States v. Ortiz, 143 F.3d 728, 732 (2d Cir. 1998) (quoting United States v. Martino, 664 F.2d 860, 867 (2d Cir. 1981)).  "The passage of time is not controlling and is but one factor to be considered, along with the kind of property sought and the nature of the criminal activity" as well as the duration of the criminal activity.  United States v. Singh, 390 F.3d 168, 181-82 (2d Cir. 2004). The passage of time becomes less significant "when the supporting facts 'present a picture of continuing conduct or an ongoing activity.'"  Id. at 181 (quoting Ortiz, 143 F.3d at 728). Staleness is a matter of whether probable cause exists, at the time of the application for the warrant, to believe that the items to be seized are in the place to be searched and, by law, the records were still within the time when they were required to be kept.  Staleness is a flexible

concept that depends largely upon the items to be seized. See United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983). Here, the conspiracy was still ongoing.

In Singh, the Second Circuit held that a period of more than twenty months between an informant's information regarding a doctor's fraudulent billing practice and the search warrant application was not stale given the ongoing and long-term nature of the fraudulent activity. Id. Similarly, given the nature of the crime and the evidence of its ongoing nature in this case, the information in the affidavit is not too stale to support a finding of probable cause. See, e.g., United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) (probable cause not stale despite 18-month delay between informant's statement and wiretap application).

### C.   The Search Warrants Were Particular and Not Overbroad

Defendants claim that the items listed to be seized in the November 2018 warrants were overbroad as there was no particularity to seize the described items.   (Joint Def. Mem. at 21-23).  Particularity requires that the warrants (i) have an identification of the specific offense for which the agents have established probable cause, (ii) describe the place to be searched and (iii) specify the items to be seized.  United States v. Jacobson, 4 F. Supp. 3d 515 (E.D.N.Y. 2014).

Defendants cite United States v. Zemlyansky, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) and United States v. Cioffi, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) in support of this lack of particularity and overbreadth argument.  Those cases are distinguishable.  In both of those cases, the search warrants did not limit the searches to items related to an alleged crime.  See Zemlyansky, 945 F. Supp. 2d at 458; Cioffi, 668 F. Supp. 2d at 396.  In defendants' arguments

on these issues, they also cite a series of other cases that similarly have to do with a failure to identify the crimes for which evidence is sought in a search.  That is a basis for suppression in this circuit but those cases are wholly inapplicable as this search warrants included specific federal crimes for which evidence should be seized.  Defendants cite (Joint Def. Mem. at 22-23) United States v. Wey, 256 F.Supp.3d (S.D.N.Y. 2017) (no crimes were listed); United States v. Kow, 58 F3d 423 (9th Cir. 1995) (the warrant gave no indication of the alleged crimes to which documents pertained); United States v. Vilar, 2007 WL 1075041 (2d Cir. 2008) (nowhere does the warrant indicate the specific acts of wrongdoing being investigated).  United States v. Galpin, 720 F.3d 436 (2d Cir. 2013) (search for documents related to violation of NYS Penal Law and/or Federal Statutes a violation of particularity); United States v. Clark, 638 F3d 89, 100 (2d Cir. 2011).  Thus, defendants cite cases that are easily distinguishable from this case where a series of specific federal crimes was listed.  Unlike the warrants in Zemlyansky, the listing of items in the search warrants in this case is consistent with other search warrants where challenges have been rejected.  See United States v. Dupree, 781 F. Supp. 2d 115 (E.D.N.Y. 2001) (Matsumoto, J.); Hernandez, 2010 WL 26544 (S.D.N.Y.); Levy, 2013 WL 664712 (S.D.N.Y.)(broad categories, no time frame).

Further, the defendants' argument that the evidence should be suppressed because there is no temporal limitation in the November 2018 search warrants is misplaced. "A temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity." United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 58 (D. Conn. 2002).  The absence of a time limit does not render the warrant a prohibited general warrant. U.S. v. Lloyd, 1998 WL 846822 (E.D.N.Y. 1998).  The Government agrees that the November

2018 warrants inadvertently omitted the time limit covered by the search.   However, the seizure of evidence pursuant to the Court's order is legally sound, as the warrant was supported by detailed probable cause statements, and is otherwise particularized.   In fact, agents used the time limit in the indictment attached to the Szwalek Affidavit for the searches.  (Affidavit 1 at ¶ 17; Affidavit 2.)  Because the crimes described in the Szwalek Affidavit are complex, wide-ranging, and pervasive to the Khwaja Companies business, the warrants, correspondingly, calls for the seizure of many documents and records.  This is appropriate, and fully compliant with the Fourth Amendment.   In any event, as discussed, a specific time limitation, that in the indictment, was used in the New York and Florida searches.  United States v. Costin, 2006 WL 2522377 (D. Conn. 2006) (did not reach time limit question as good faith applied- the court holds that the good faith exception applies with respect to any deficiency arising in probable cause from the lack of a time limit).   Notably, in this case, because most of the evidence seized in the November 2018 search warrants was electronic, there were two steps at which the time limit in the indictment was used, upon seizure at the search site and in conducting the search of the electronic device.  See Affidavit 1 at ¶ 17, 40-41 and Affidavit 2.

In sum, under existing law, the lack of a temporal limitation does not render a search warrant defective.  The "Second Circuit has yet to consider the effect the lack of a time frame has on a warrant's breadth or its particularity."  See Hernandez, 2010 WL 26544, at *9. "A temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity."  Id. at 11 (citations and quotation marks omitted); see also United States v. Gotti, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (lack of time limitation did not render warrant

defective).  In <u>Hernandez</u>, for example, the district court upheld a warrant seeking records from a tax preparation business that did not contain a date range restriction because of the "complex nature of the criminal scheme and the number of years in which it was ongoing."  <u>Hernandez</u>, 2010 WL 26544, at *9.  As <u>Hernandez</u> recognized, this is a case-by-case determination, but, significantly, "[u]nlike in a more straightforward, single-act' criminal cases, a time frame is less relevant to a warrant's breadth where the criminal acts are complex and necessarily extend over a significant period of time."  <u>Id</u>. (citations omitted).  Thus, "[g]iven the complex nature of the criminal scheme and the number of years in which it was ongoing, a lack of specific time frame in the search warrants is not sufficient in and of itself to render the warrants constitutionally overbroad."  <u>Id</u>. (citations omitted).[14]  The same holds true in the present case – the crime described in the Szwalek Affidavit is complex, span several years, and involved a large number of companies and individuals throughout the investigation and the defendants' money laundering scheme.

In their arguments on overbreadth and lack of particularity, defendants take excerpts from the warrant (e.g., "any and all business records relating to the subject premises" – see item 2 in Exhibit A, attachment to the search warrant) and claim that the excerpt would allow the agents to "pick and choose documents that appear of interest but are not tethered to any probable cause" (Joint Def. Mem. at 24).  This line of argument ignores both what precedes the excerpt and what follows it, namely that first the documents must be evidence, fruits or

---

[14]  The <u>Levy</u> court held that it need not resolve whether the lack of a temporal limitation rendered the warrant unconstitutional "because the continuing uncertainty in this Circuit regarding this issue triggers the good-faith exception to the exclusionary rule."  <u>Levy</u>, 2013 WL 664712, at *10.

instrumentalities of specific identified federal crimes and, second, that the document must fit into one of the specific enumerated categories of business records such as accounts receivable ("the language of a warrant is to be construed in light of an illustrative list of seizable items") U.S. v. Riley, 906 F.2d 841 (2d Cir. 1990). In Riley, the Second Circuit approved using an illustrative but not exhaustive list with "including but not limited to" language. Id. at 844. District Courts have also approved such language. United States v. Jacobson, 4 F. Supp.3d at 515, 519 (E.D.N.Y. 2014) ("any and all records, data and correspondence including but not limited to" in a warrant without a temporal limitation); United States v. D'Amico, 734 F.Supp.2d at 321, 358 (S.D.N.Y. 2010) ("all records including but not limited to"). It is settled that a list provides examples of items to be seized albeit a list modified by "including but not limited to" language offers sufficient guidance to law enforcement officers to pass constitutional requirements. U.S. v. Lustyik, 57 F.Supp.3d 213 (S.D.N.Y. 2013). In fact, under D'Amico, all records were obtainable in this case where there is probable cause to believe that the Khwaja Companies were using their companies to launder South American drug trafficking monies to enable the government to examine a complete picture of the funds flowing into and out of the company. D'Amico at 321.

Similarly, while defendants claim #5 of the attachment to the search warrants allows the seizure of any document that mentions one of the listed targets or subjects, that is misleading as well. It is improper to read selected portions of a warrant as being overbroad or not particular enough when, read in context, the language contains sufficient particularity requiring a nexus to specific federal crimes. Jacobson, supra; United States v. Wagner, 951 F.3d 1232 (10th Cir. 2020). Again, that claim ignores the specific limitation placed on the

responsive documents by the listing of specific federal crimes and the other limitation, the nineteen types of documents listed, many of which would be evidence of, among other crimes, interstate and foreign travel in aid of racketeering enterprises, one of the specified federal crimes because here, in sharp contrast to Zemlyansky, the affiant on the Khwaja warrants, SA Szwalek led the New York and Florida search teams, briefed the team leaders on the New York search teams prior to the searches and responded to many questions posed by agents during the search about what documents fell within the scope of the warrant.  See Affidavit 1 at ¶ 42. In addition, all searching agents were given a copy of the attachment to the warrant and were advised at the staging meeting of the investigation as detailed in the affidavit and of the time frame to be used for responsive documents. Indeed, sections of the affidavit in support of the application for search warrants was read to the team leaders.  See Affidavit 1 at ¶ 17.  In contrast, in Zemlyansky, unlike here, the affiant did not lead the search or supervise its execution where, as here, the case agent was physically present and in charge at every step of the investigation and search.  United States v. Rosa, 626 F.3d 56 (2d Cir. 2010).

Further, defendants' suggestion that authorizing the seizure of "all cell phones" was a violation (Joint Def. Mem. at 24) is wrong.  Defendants' citation of the Griffith case (867 F.3d 1265 (D.C. Cir. 2017)) at Joint Def. Mem. at 24, 29, where there was no reason to suspect defendant Griffith had a cellphone let alone it would be in his residence stands in sharp contrast to this search where wiretaps and precision location data had shown that defendants were using their phones from their residences to further the conspiracy and seizure and search of phones was limited to phones that were evidence of the enumerated crimes. See Affidavit 1 at ¶ 35. Again, defendants challenge an excerpt of the search warrant rather than the entirety

of it which would include the limitation of limiting the cell phones seized to those likely to contain evidence, fruits and instrumentalities of the specified federal crimes.  That is why phones not likely to contain such material were promptly returned.  See Affidavit 1 at ¶ 27.

### D.   The Government Promptly Searched the Evidence

As the Szwalek Motion Affidavit makes clear, there was no delay in searching the seized evidence, either hard copy or electronic.  See Affidavit 1 at ¶¶ 28-44. Additional agents were put on the search in addition to the forensic agents who worked on opening devices, creating searchable images and clearing devices for return.  All that occurred from the date of the seizure was efficient, expeditious and, most important of all, reasonable.  Id.  First, the search of the seized evidence was reasonable as it was conducted in accordance with the affidavits submitted in support of the search warrants, including the  "Computers, Electronic Storage and Forensic Analysis" ("Computer Section").

Staffing of the search of seized items was significant and there was no delay. Id.

## IV.   The Good Faith Doctrine

### A.   Legal Standard

The Fourth Amendment's particularity requirement targets "the specific evil [of] the 'general warrant' abhorred by the colonists." Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).   A particularized warrant "prevents the seizure of one thing under a warrant describing another." United States v. Buck, 813 F.2d 588, 590–91 (2d Cir. 1987).  In other words, it is meant to prevent the "general, exploratory rummaging in a person's belongings." Id.  A warrant is sufficiently particular if it "enable[s] the executing

officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." United States v. George, 975 F.2d 72, 75 (2d Cir.1992). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Buck, 813 F.2d at 590–91 (quoting Marron v. United States, 275 U.S. 192, 196, (1927)).

As discussed above, defendants challenge both the particularity of the search warrant as well as its breadth.  Particularity is the requirement that the warrant must clearly state what is sought.  Overbreath deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based.  United States v. Jacobson, 4 F. Supp. 3d 515 (E.D.N.Y. 2014).  A warrant is insufficiently particularized if the warrant, on its face, fails to provide the necessary guidelines for the search by the executing officers. See United States v. Zemlyansky, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013); United States v. Rosa, 626 F.3d 56 (2d Cir. 2010) (good faith protects objectively reasonable law enforcement activity).  As set forth above, the search warrants challenged herein were sufficiently particular.

Defendant's citation of the irrelevant United States v. Metter, 860 F.Supp.2d 205 (E.D.N.Y. 2012) and United States v. Debbi, 244 F.Supp.2d 235 (S.D.N.Y. 2003) cases (Joint Def. Mem. at 31-32) does not aid their demands.  Metter dealt with a case in which the Government did not begin its review for 15 months after seizure.  In contrast, in this case, the review started on the day of seizure. See Affidavit 1 at ¶ 28.  As for the Debbi case, that deals with repeated failures by the government to separate out irrelevant files including (i) seizure of personal and religious files outside the scope of the warrant with no attempt to separate these items out, (ii) return of only a limited portion of these irrelevant records after months,

74

(iii) failure to separate out personal files from responsive ones during searches of residence and after filing of motion to suppress and (iv) advising court at oral argument eight months after seizure that, instead of separating out materials as court requested, prosecutor would wait for court's decision.  Debbi at 237-238.  In contrast, here, any seized materials that fell outside the scope of the search warrants were promptly returned and, as the record makes clear, all directions of the court including the six orders issued at the June 2019 conference were promptly carried out.

These search warrants gave the agents discretion which was proper. There must be some room in warrants for law enforcement discretion. "[C]courts have recognized that executing [law enforcement] agents must have as a practical matter 'some discretion . . . to interpret the words of every warrant no matter how particularly the items to be seized are described . . .' "  United States v. Regan, 706 F. Supp. 1102, 1110 (S.D.N.Y. 1989) (quoting United States v. Marti, 421 F.2d 1263, 1268 (2d Cir. 1970)).  "The standard for constitutional particularity thus requires only that a warrant be 'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'" Id. (quoting United States v. LaChance, 788 F.2d 856, 874 (2d Cir. 1986)).  The focus is therefore "primarily on the effect of the terms of the warrant upon the agent, i.e., whether the agent can rationally understand and implement these terms." Id.  The particularity requirement seeks to cabin any discretion on the part of the executing agents, though "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances." See Buck, 813 F.2d 588, 590 (2d Cir.1987).

The particularity requirement must be applied with "flexibility" and requires only "reasonable specificity" and not "surgical precision." United States v. Triumph Capital Group, Inc, 211 F.R.D. 31, 57 (D. Conn. 2002). "Courts must avoid a hypertechnical approach by heeding the admonition that the Fourth Amendment's commands . . . are practical and not abstract . . ." United States v. Christine, 687 F. 2d 749, 760 (3d Cir. 1982) ("flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records"). "The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated." Regan, 706 F. Supp. at 1113. There can be reasonable reliance on a subsequently invalidated search warrant. Leon, 468 U.S. at 992. Defendants citation of U.S. v. Clark, 638 F.3d 89 (2d Cir. 2011) (Joint Def. Mem. at 26) doesn't aid them. Although their citation and discussion implies that, there, the Second Circuit had suppressed evidence in a similar case and declined to apply the good faith defense, the fact is that the quote used by defendants was not a holding, simply a citation of the overarching rule set in other cases and, in Clark, the good faith exception was applied. Id. at 100.

Under the good faith rule, the government may use evidence obtained in violation of the Fourth Amendment, as long as the searching officer objectively and reasonably relied on the subsequently invalidated search warrant. See United States v. Leon, 468 U.S. 897, 921-922, 104 S. Ct. 3405, 3419-20, 82 L.Ed.2d 677 (1984). Leon teaches that the only exceptions to the doctrine of good faith reliance are situations where: "(1) where the issuing [judge] has been knowingly mislead; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render

reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable." United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008)

### B.    The Good Faith Exception Applies to Both the Wiretap and the Warrants

#### 1.    The Good Faith Exception Applies to the Wiretap Orders

As detailed in the Statement of Facts, several district court judges (Judges Bianco, Seybert and Spatt) signed Wiretap Orders in connection with the wiretaps in this case. The wiretap application (part of Ex. B hereto) detailed the money laundering operation that had been uncovered through various investigative techniques.

The Good Faith Exception also applies to wiretap evidence. Even if a Title III application does not establish probable cause, evidence resulting from that wiretap should not be suppressed if the law enforcement authorities relied in good faith on the sufficiency of the wiretap warrant.  Although Title III has its own exclusionary remedy for evidence seized in violation of Title III, see 18 U.S.C. § 2515, the Second Circuit and courts in this circuit have applied exceptions to the exclusionary rule to claims of unlawfully obtained wiretaps.  See, e.g., United States v. Bianco, 998 F.2d 1112, 1125-26 (2d Cir. 1993) (holding that Franks standard should be applied to alleged falsehoods or omissions in Title III affidavits); Ambrosio, 898 F. Supp. at 187-88 (applying good-faith exception to the exclusionary rule established in United States v. Leon, 468 U.S. 897 (1984) to Title III suppression claim, although noting split among district courts on this issue).  Under Leon, "suppression of evidence is proper only if: (1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the affidavit supporting the issuance of the wiretap

order; or (3) the agent's reliance on the warrant was not objectively reasonable." Ambrosio, 898 F. Supp. at 189.

The Court should also deny the motion to suppress because the Good Faith exception to the Fourth Amendment's exclusionary rule applies.  The wiretap application contained probable cause and defendants' repeated suggestions that linking the Khwaja Companies was misleading ignores the facts discussed herein. See Affidavit 1 at ¶¶ 8-9.  The companies, among other things (see supra at pgs. 3-5) were all part of the same conspiracy and the companies (i) took monies from drug traffickers and then folded it into their books and records, (ii) took monies from third parties with whom they did no business, and (iii) dealt with the South American money laundering companies and individuals, all as part of the money laundering conspiracy. See Affidavit 1 at ¶¶ 3-7.

Under United States v. Leon, 468 U.S. 897 (1984), the exclusionary rule does not apply to "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" unless (1) the "issuing magistrate has been knowingly misled;" (2) the magistrate "wholly abandoned his or her judicial role;" (3) the warrant Affidavit is "so lacking in indicia of probable cause as to render reliance upon it unreasonable"; or (4) the warrant is "so facially deficient that reliance upon it is unreasonable." United States v. Galpin, 720 F.3d 436, 452 (2d Cir. 2013) (quoting United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992)).  As noted in United States v. Barnes, 13 Cr. 387 (AJN), slip op at 19 (SDNY 2013). "[b]ehind this rule lies courts' recognition that suppressing evidence of crimes imposes meaningful social costs, which are justified only if the Government's conduct was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such

78

deterrence is worth the price."  Defendants claim that probable cause for the wiretap was based on material omissions points to implying a connection between the Khwaja Companies

Leon is a totality of circumstances test and teaches that most search conducted pursuant to a warrant fall within the good faith exception.  Even if the court were to find that the warrant violated particularity requirements, notwithstanding these arguments and the deferential standard of review applicable here, suppression would not be the appropriate remedy.  This is because the challenged evidence was "obtained in objectively reasonable, concise, meaningful descriptions of the categories of records that could be seized pursuant to the warrant, there is no basis for this Court to conclude that a "well trained officer would have known that the search was illegal despite the magistrate's authorization."  Id. at 922 n.3. Here, it was the authorization of three district court judges.

### 2.    The Good Faith Exception Applies to the Search Warrants

Here the Szwalek search warrant affidavit and the Nunez search warrant affidavit were detailed and, as discussed above, contained no material omissions or falsehoods. Nor is there anything to suggest that Magistrate Judge Shields in EDNY or Magistrate Judge Goodman in SD Florida abdicated their judicial roles in consideration of those applications. See United States v. Clark, 638 F.3d 89, 100-101 (2d Cir. 2011).  The agents here were surely "justified in executing the warrant." Falso, 544 F.3d at 128. Finally, given the broad scope of the scheme detailed in the warrant application, and the complex nature of financial fraud generally, the agents would have reasonably presumed the warrant to be valid.  Further, the agents understood that the time frame of responsive documents was the time frame set forth in

the indictment for the conspiracy, October 2013 to the date of the indictment. See Affidavit 1 at ¶¶ 7-18

The Khwaja Companies were involved in a complex money laundering conspiracy. United States v. Christine, 687 F. 2d 749, 760 (3d Cir. 1982) ("flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records").   Hence the items to be searched contained on Attachment H to the warrants include the  categories of records set forth in page 17 above, but always limited to evidence, fruits and instrumentalities of the specified crimes, namely money laundering, structuring, unlicensed money remitting, interstate or foreign travel in aid of racketeering.  Indeed, when the criminal activities pervade an entire business, as here, seizure of all the records of the business is appropriate and broad language used on warrants cannot offend the particularity requirements. U.S. Postal Service v. CEC Service, 869 F.2d 184 (2d Cir. 1989).

The Affidavits, both the Szwalek SW Affidavit (part of Ex. A) and the Nunez SW Affidavit (part of Ex. D)  rely on the agents' past experience and expertise, their work on this investigation, outlined the probable cause for these records, including the wire intercepts (see Affidavit 1 at ¶ 16-19; Affidavit 3).   The evidence sought under the search warrants amounted to the relevant books and records of the businesses, not unlike any other financial warrant.  The defendant is correct in noting that, unlike the Affidavit, the warrant itself did not reference a time limit.  Nevertheless, even if this Court held that this gave the November search warrants a lack of particularity, the good faith doctrine would preclude suppression in this case. The inadvertent deficiency in the form of the warrant did not affect the good faith of the agents

80

in the execution and seizure of evidence.  First, the agents used a time limit, understanding that the time limit in the indictment was applicable.  See Affidavit 1 at ¶ 17; Affidavit 3. Second, the continuing uncertainty regarding the time limit issue triggers the good faith exception to the exclusionary rule.

In Zemlyansky, relied on by the defense (Def. Mem. At 35), unlike here, the affiant did not lead the search or supervise its execution where, as here, the case agent was physically present and in charge at every step of the investigation and search.  Where that was true, good faith was applied after the Court examined warrants, in United States v. Lustyik, 57 F.Supp.3d 213 (SDNY, 2014) and United States v. Romain, 678 Fed. Appx. 23 (2d Cir. 2017) (Summary Order); see also United States v. Melvin Cwibeker, 12 CR 632 (JS), 2014 WL 7423106 (2014) (Agents good faith in executing the warrant precluded suppression).

The Supreme Court has instructed that reviewing courts must be mindful that most searches conducted pursuant to a warrant would likely fall within the good faith protection.  An affidavit must show that a crime was committed and the indictment was ample proof of that and that there is probable cause to believe that evidence of such a crime is located in the place to be searched.  These affidavits had both.  It is notable that the exclusionary rule does not apply to evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.  Jacobson at 522.  In addition, in Rosa, Cwibeker, and here, each search officer was notified and advised of the contents of the affidavit in support of the search warrant. SA Szwalek related the sum and substance of the affidavit to each team leader of the New York search teams at a pre-execution meeting.   Copies were available at the search site.

81

Here, there is no credible or objective sign that the agents acted in anything other than good faith, indeed even if they discussed the crimes they were searching evidence for with the defendant, as he asserts, that does not indicate that they then knew they were without authority to execute the warrant issued by Judge Shields.   Their actions followed their understanding of the warrants and their affidavits.   See Affidavit 1 at ¶¶ 21-27.

Defendants' suggestion that there was no probable cause to search Abdul's house because the linkage of the Khwaja Companies failed to distinguish between them.   As set forth in the Statement of Facts and Point II, the Khwaja Companies are linked by their involvement in the money laundering conspiracy.   Defendants' inference that this is a situation where Abdul happens to be in the company of a defendant ignores the facts.   Abdul is in the conspiracy and charged with it and was indicted before the search warrants were issued. Further, defendants' suggestion that discussing structuring by E. Khwaja does not implicate A. Khwaja ignores that all the structuring was done to further the conspiracy, whether it was A. Khwaja structuring postal money orders or E. Khwaja structuring the deposit of cash.   It was all structuring by the Khwaja Companies to further the conspiracy.

The evidence showed, and the affidavit stated, that Shikeba and Abdul conducted the business of the Khwaja Companies, money laundering, from their residence and received documents including bank statements of accounts that had monies funneled through them at their residences.

Further, the execution of the search warrants, both in seizing and searching, was done in good faith.   Contrary to defendant's claim (Joint Def. Mem. at 29-30), Rhamatzada was given a copy of the search warrant and, although an inventory was not left as it should

82

have been, it was provided a few days later.    See Affidavit 1 at ¶ 19.  Accordingly, there was

no prejudice. Jacobson at 523.  The suggestion that linking the Khwaja Companies misled the

Court ignores all the links that exist among the companies including their joint participation in

the money laundering conspiracy. (Joint Def. Mem. at 29).   Defendants' complaint about

seizure of non-responsive materials from Shikeba's residence (Joint Def. Mem. at 30) fails to

advise the court that most of the material was commingled and all of it was promptly returned.

See Affidavit 1 at ¶ 44.

Finally, defendants persist in misleading the court by claiming that no device

was searched for seven months.  Although the government has written to the Court to reiterate

that the search protocol refers to the imaged server, defendants cling to the fiction that devices

were not searched until ten months later ("waited for ten months before beginning to search

the electronic devices" at Joint Def. Mom. at 21-22). This falsehood is a key basis for this

suppression argument.  Defendant also complains that the government's search protocol "did

not constitute a valid search protocol." (Joint Def. Mem. at 8).  A search protocol tells the court

how agents will search an electronic device for relevant documents.  Defense counsel have set

themselves up as the arbiter of proper search protocols and cite nothing for their assertion

("without a search protocol that limited in any meaningful way the scope of the search" at Joint

Def. Mem. at 22).  First, defendants' attempt to constitutionalize a search protocol is meritless.

The Second Circuit has not required even the use of one.  U.S. v. Lustyik, 57 F.Supp.3d 213,

229 (SDNY 2014).  Second, the search warrants did not require any specific search method.

Third, insofar as the application for the search warrants specified a method of imaging devices

and proceeding, that outline was followed. See Affidavit 1 at ¶ 28.  Fourth, the method used

by the government to search the devices of this criminal enterprise was reasonable and that is the proper measure not a search protocol that is "valid" to a set of defense attorneys. The Second Circuit has recognized that it is often impossible to identify in advance the words or phrases that will separate relevant from irrelevant files. There is no way to anticipate how criminals like the defendants will store documents relevant to the charged crimes. U.S. v. Ulbricht, 858 F.3d 71 (2d Cir. 2017) ("Ulbricht").

Defendants A. Khwaja and E. Khwaja were both operating companies taking in millions of dollars from drug traffickers and third parties with whom their companies had no business as part of the Farhat MLO. See Affidavit 1 at ¶ 2-7. There was no way to anticipate how they tracked and accounted for these illegal revenues but a file labelled "Payments from Drug Traffickers For Diesel" was neither expected nor located. Companies like the Khwaja Companies engaged in pervasive criminality use misleading or code names and simple codes can defeat a pre-planned word search. Ulbricht.

Disguising files is a well-known occurrence among the criminal set. U.S. v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010) ("Drug Testing"). Ulbricht and Drug Testing recognized the need, in seizing electronic devices, to scoop up large quantities of data and sift through it carefully for concealed or disguised pieces of evidence. Drug Testing at 1176. The courts have recognized that there is no way to be sure what an electronic file contains without somehow examining its contents. Whether you open and look, use forensic searches or keyword searches or some other method, overseizing and then searching is an inherent part of electronic searches of devices used by criminal enterprises like the Khwaja Companies.

84

The Second Circuit stated that the exclusion decision under the Good Faith Exception is a two-step process.  First, the police conduct must be sufficiently deliberate that exclusion can meaningfully deter it and second, if that test is met, the conduct must be sufficiently culpable that such deterrence is worth the price paid by the justice system.  Rosa at 64.  The Second Circuit also noted that, although unattached supporting document could no longer cure a constitutionally defective search warrant, those documents, like the Szwalek Wiretap Application and Szwalek and Nunez Search Warrant Affidavits, are still relevant to determine if the officers acted in good faith, because they inform the assessment of the officers' conduct in a case. Id.  In addition, the Szwalek Motion Affidavit details the reasonable of the execution of the searches and the search of the seized material.  No deliberate misconduct is presented here. U.S. v. Thomas, 908 F.3d 68 (4th Cir. 2018).

In United States v. Hurst, 2012 WL 3089743 (N.D. W. Va. 2012), the court noted that the Supreme Court had approved the procedure of looking first to the "good faith" exception and only if there was no good faith, proceeding to the probable cause evaluation. The court noted that suppression should only occur if the officer knew, or could properly be charged with knowledge, that the search was unconstitutional. Id. at 4.  A situation that does not exist here.

In United States v. McDarrah, 2006 WL 1997638 (S.D.N.Y. 2006), the Court found that even if a warrant was overbroad, the good-faith exception applied to the search, noting that "in a doubtful case, [courts] accord preference to the warrant." McDarrah, 2006 WL 1997638 (quoting United States v. Irving, 432 F.3d 401, 416 (2d Cir.2005)).  The Second Circuit, in affirming, held that the good-faith exception applied "because the agents acted in

good faith in seeking the warrant and reasonably relied upon it in conducting the search." McDarrah, 351 Fed. Appx. at 561 (2d Cir. 2009).

For both wiretaps and search warrants, the affidavits submitted by Special Agent Szwalek and Nunez make it clear that the agents worked with many DOJ Attorneys and AUSAs in preparing their affidavits, that Szwalek submitted his wiretap applications to six federal judges (all of whom approved the wiretap and search warrant applications) and, in regard to both the wiretaps and the search warrants, followed their undertakings in their affidavits (minimization for wiretaps and search procedures for electronic media). See Affidavit at 1 ¶ 8, 15-16; Affidavit 3.

Here, the Search Warrant and the Affidavit made clear that the purpose of the warrant was to find evidence of specific criminal offenses – that is, Money Laundering, Structuring and Failing to File CTRs, operating an unlicensed money transmitting business. And, as articulated above, the Government team did not search items other than what it would have searched in any event if the time frame had been in the search warrant as well as in the indictment that was used. In light of this evidence of good faith, and consistent with the case law, suppressing physical evidence on the basis of an instance of a clerical error "would be incompatible with the principles underlying the exclusionary rule." Rosa, 626 F.3d at 65 (distinguishing United States v. George, 975 F.2d 72 (2d Cir. 1992)). Because the Government's conduct in obtaining the warrants was not so "flagrant" or "culpable" as to require deterrence, United States v. Clark, 638 F.3d 89, 104 (2d Cir. 2010) (quotation omitted), the good faith exception applies to the evidence seized from the wiretap orders and the search warrants.  Accordingly, the motion should be denied.

86

**POINT IV**

**DEFENDANTS' MOTION FOR A
BILL OF PARTICULARS SHOULD BE DENIED**

Defendants A. Khwaja and Rhamatzada move for a bill of particulars as to the structuring count (Count Five) and the travel and transportation in aid of racketeering count (Count Six).  See Joint Def. Mem. at 44-46.  Defendant Saenz joins in this motion.  See Saenz Mem. at 1, 12.

**I.     Applicable Law**

As set forth above, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c) (1).  It is well-settled that the scope and function of a bill of particulars is to furnish facts supplemental to those contained in the indictment that are necessary to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense, to avoid or minimize the danger of surprise at trial, and to enable the accused to plead his acquittal or conviction in bar of further prosecution for the same offense.  Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Torres, 901 F.2d 205, 234 (1990).

Because the formal effect of a bill of particulars is to limit the government's proof at trial to the particulars provided, see, e.g., United States v. Glaze, 313 F.2d 757, 759 (2d Cir. 1963), a bill of particulars should be required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  Torres, 901 F.2d at 234 (quotations omitted).  The ultimate test is whether the information sought is necessary, not whether it might be helpful to the defense.  United States v. Weinberg, 656 F. Supp. 1020, 1029 (E.D.N.Y. 1987) (McLaughlin, J.) (citations omitted).

87

"It is not the function of a bill of particulars to obtain a preview of, and to proscribe, the government's evidence before trial." United States v. Kyongja Kang, No. 04 CR 87 (ILG), 2004 U.S. Dist. LEXIS 29885, *3-4 (E.D.N.Y. Dec. 22, 2004) (Glasser, J). Nor should it be used as a device to obtain detailed disclosure of the government's evidence prior to trial, or as a means to inquire into the government's legal or evidentiary theory of its case. United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974).

Furthermore, the defendant is not entitled to discover through a bill of particulars the exact dates, times and places at which a crime occurred, or the identities of witnesses or documents that will establish the charged crime. See United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985). Indeed, requests by a defendant for a disclosure of the "wheres, whens and with whoms" of acts by coconspirators have been rejected by the Second Circuit as impermissible attempts to force the government to particularize all of its evidence." United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); see also United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990), aff'd, 968 F.2d 242 (2d Cir. 1992); United States v. Lorenzano, No. 03-1256 (S-6)(JFK), 2005 WL 975980, at *3 (S.D.N.Y. 2005); United States v. Berganza, No. 03-987 (S-4)(DAB), 2005 WL 372045, at *5 (S.D.N.Y. 2005); United States v. Mitlof, 165 F.Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars where defendant sought details of the "wheres, whens and with whoms" that courts have held to be beyond the scope of a bill of particulars) (citations omitted). Because a bill of particulars serves merely to inform the defendant of the nature of the charges, it may not be used to acquire "evidentiary detail," or as an investigative tool for the defense. Torres, 901 F.2d at 234. See United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (recognizing that the

Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime'") (quoting United States v. Tramunti, 5413 F.2d 1087, 1113 (2d Cir.), cert. denied, 423 U.S. 832 (1975)).

## II.   **Discussion**

Here, the defendants have been informed of the charges against him/her with sufficient precision to enable each defendant to prepare his/her defense, avoid or minimize the danger of surprise at trial, and to enable him/her to plead his/her acquittal or conviction in bar of further prosecution for the same offense.  Thus, the Indictment adequately places each defendant on notice of the charges against him or her.  The Indictment cites to and tracks the language of the relevant statutes; it specifically identifies the elements of the offense charged, the time period, location and nature of the crimes the defendant is alleged to have committed, and the allegations against the defendant.

Further, the government has now provided many additional details concerning the charged crimes and the evidence the government expects to adduce at trial. That information is contained in, among other sources:  (1) this memorandum, which contains details of the government's evidence; (2) materials produced pursuant to the government's obligations under Fed. R. Crim. P. 16; and (3) the government's discussions with defense counsel regarding the scope and breadth of the evidence in this case.  Indeed, it is worth noting that, in the presentations made to each of the defendants, the government highlighted their respective client's culpability and extensive, detailed information was presented regarding structuring.  See Affidavit 1 at ¶ 54.  For example, regarding the structuring charges in the

indictment, an approximate total amount of structured funds was provided to counsel demonstrating structuring in accounts of both Tronix and National and the accounts were identified.   The summary sheets of the highlights for each defendant, which were provided whether or not they attended a reverse proffer, provided additional information well beyond Rule 16 discovery to defendants.  See Attachment C to Affidavit 1.

No additional particulars are warranted.  See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." (citations and quotation marks omitted)).  See also United States v. Walters, 963 F. Supp. 2d 125, 134 (E.D.N.Y. 2013) (Gershon, J.) (denying defendant's request for bill of particulars for alleged wire fraud conspiracy and money laundering conspiracy where government has provided bank records showing various banking transactions).

Furthermore, defendants are not entitled to discover through a bill of particulars the exact times and places at which a crime occurred, or the identities of witnesses or documents that will establish the charged crime.  See United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).  Indeed, as already noted, requests by a defendant for a disclosure of the "wheres, whens and with whoms" of acts by coconspirators have been rejected by the Second Circuit as impermissible attempts to force the government to particularize all of its evidence."  Cephas, 937 at 823; see also Mitlof, 165 F. Supp.2d at 569 (denying request for bill of particulars where defendant sought details of the "wheres, whens and with whoms" that courts have held to be beyond the scope of a bill of particulars) (citations omitted).  Because a bill of particulars serves merely to inform the defendant of the nature of the charges, it may

not be used to acquire "evidentiary detail," or as an investigative tool for the defense. <u>Torres</u>, 901 F.2d at 234.

        Here, particularly in light of the reverse proffers the government has already conducted and the highlights provided, the defendants' demands for a bill of particulars improperly attempts to obtain a detailed preview of the government's evidence and legal theory prior to trial, which is precisely the type of information that is not subject to a bill of particulars. <u>See</u>, <u>e.g.</u>, <u>Torres</u>, 901 F.2d at 234.   Indeed, the defendants are attempting to force the government to disclose evidentiary details that have been expressly held to be beyond the scope of a bill of particulars.   As set forth above, the law does not require the government to provide the precise conduct or roles played by each defendant or his coconspirators.  <u>See</u>, <u>e.g.</u>, <u>United States v. Jones</u>, 1986 WL 275, at *2 (S.D.N.Y. 1986) ("the government is under no obligation to disclose the specific role played by a defendant . . .or the particular acts each defendant is alleged to have participated in, had knowledge of, or for which he is being held responsible").   Nor is the defendant entitled to discover through a bill of particulars the specific dates, times and locations of each transaction. Accordingly, the defendants' requests for evidentiary details concerning the charged crimes fall precisely within the class of materials that courts have held to be outside the scope of a bill of particulars, and his motion should be denied.

        The defendant does not need the requested information in order to prepare a defense.   Instead, they are on a fishing expedition to assess the strength of the government's case and to determine who is cooperating.   Neither is a proper basis for a bill of particulars.

In sum, the defendants are aware of the charges against him or her and each is able to prepare his or her defense.  The defendants seek information that falls outside the proper scope and function of a bill of particulars and, as such, their motions for a bill of particulars should be denied.

## POINT V

## THE DEFENDANTS' VARIOUS DISCOVERY MOTIONS SHOULD BE DENIED

### I.      Defendants' Request for the IRS Audit Should Be Denied As Moot

Defendants A. Khwaja and Rhamatzada demand a copy of the IRS audit of National's 8300 compliance.  See Joint Def. Mem. at 47.  The IRS audit is available to the defendants under FOIA.  For its part, the government is statutorily prohibited from obtaining the audit for its own use without a court order. 26 U.S.C. Section 6103.  We recently asked defense counsel for A. Khwaja and Rhamatzada if they had sought the document under FOIA but they have not.  Nevertheless, to avoid having the court decide this prong of the motion, the government, if the Court wishes, will submit an order to the court allowing the government to obtain this document and, if approved, to give the defendants who are qualified to receive it under FOIA, a copy.

### II.     Defendants' Request for Expedited 3500, Witness Lists and Trial Exhibits Should Be Denied

Defendants E. Khwaja and Bokhari move for an expedited schedule for the filing of the government's motions pursuant to Fed. R. Crim. P. 404(b), expert disclosure, and the production of the government's witness list, trial exhibits and § 3500 material.  See E. Khwaja Mem. at 14-15; Bokhari Aff. at 2-3.  The government agrees to provide § 3500

92

material and an exhibit list to all defendants two weeks prior to trial.  Defendants' request for

an earlier production should be denied.

   The government submits that the production of these materials two weeks prior

to trial is sufficient and respectfully suggests that the Court not enter an order requiring the

government to produce this information any earlier.

   In Jencks v. United States, the Supreme Court held that a criminal defendant

had a due process right to inspect prior statements of government witnesses for impeachment

purposes.  353 U.S. 657, 668-69 (1957).  Congress thereafter enacted the Jencks Act, 18 U.S.C.

§ 3500, which directs that "no statement . . . by a Government witness . . . shall be the subject

of subpoena, discovery, or inspection until said witness has testified on direct examination in

the trial of the case."  See also United States v. Percevault, 490 F.2d 126, 131-32 (2d Cir. 1974)

(holding that court has no power to compel disclosure of § 3500 material prior to time

mandated by statute).  Notwithstanding the plain language of § 3500, which does not require

these materials to be produced until after a witness testifies on direct examination, consistent

with the practice in this district, and to avoid unnecessary delay, the government will produce

this material two weeks prior to trial, which will allow more than sufficient time for the defense

to review such information.  Thus, the defendants' request for earlier disclosure of § 3500

material should be denied.[15]

---

[15] To the extent the defendants' request for § 3500 material is also interpreted as a request for any material discoverable under Giglio v. United States, 405 U.S. 150 (1972), such a request should, likewise, be denied.  As a general matter, a defendant has no constitutional right to receive Giglio material prior to trial.  United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n.1 (2d Cir. 1974); United States v. Yu, No. 97-CR-102 (SJ), 1998 WL 57079, at *5 (E.D.N.Y. 1998) ("Giglio material, is not required to be produced before trial.").  The immediate disclosure of Giglio materials merely upon a defendant's request is not

With respect to an exhibit list and trial exhibits, producing an exhibit list two-weeks prior to trial is reasonable and sufficient.  Thus, the Court should deny the defendants' request for an Order requiring earlier disclosure.

Finally, defendants also request that the Court direct the government to serve notice of expert(s) and file any motions pursuant to Fed. R. Crim. P. 404(b) ninety (90) days in advance of trial.  See E. Khwaja Mem. at 14-15.  As to the expert notice, at trial, the government intends to call experts in international narcotics trafficking and money laundering. The government will provide its expert notice shortly, and, thus, defendants' request is moot. As to Rule 404(b) motions, the government submits that it will file any Rule 404(b) motion(s) in advance of the November 10, 2020 trial date, consistent with a motion schedule set by the Court for the submission of evidentiary motions to be made by any party.

## III.   Defendants' Request for a Jury Questionnaire Should Be Denied

Defendants A. Khwaja and Rhamatzada asks the Court to use a questionnaire for jury selection.  See Joint Def. Mem. at 47-49.  Defendant Saenz joins in this motion. See

---

required.  United States v. Underwood, No. 04-CR-424 (RWS), 2005 WL 927012 (S.D.N.Y. 2005) (disclosure ordered two business days prior to trial.).  "Provided that the defendant has sufficient time after receipt of Giglio material to use it effectively at trial, there is no violation of the defendant's rights from deferring production of this material until closer to the time of the witnesses' testimony."  United States v. Frank, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998); see also Grant v. Alldredge, 498 F.2d 376, 382, 383 n.7 (2d Cir. 1974).  Indeed, courts have approved disclosure of Giglio material on the day that a witness testifies.  See, e.g., United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983); United States v. Aguirre-Parra, 763 F. Supp. 1208, 1216 (S.D.N.Y. 1991) (Giglio material to be produced with 3500 material).  Here, the government agrees to produce any Giglio material two weeks before trial, along with its 3500 production, which will provide ample time for the defendant to prepare for trial.  See, e.g., United States v. Ruiz, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989), aff'd, 894 F.2d 501 (2d Cir. 1990) (approving production of Giglio material along with 3500 material day prior to witness's testimony); United States v. Biaggi, 675 F. Supp. 790, 811-12 (S.D.N.Y. 1987) (same).

Saenz Mem. at 1, 12.  Here, the Court can conduct "thorough and probing" voir dire without the use of a written questionnaire.  United States v. Salameh, 152 F.3d 88, 120-21 (2d Cir. 1998) (holding that district court did not abuse its discretion in declining to use defense questionnaire).  Accordingly, the government requests that the Court deny the defendants' application for a questionnaire.

It is well-settled that the questioning of potential jurors on voir dire is "quintessentially" a matter for the discretion of the district court.  United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002); see also Rosales-Lopez v. United States, 451 U.S. 182 (1981) (holding that district courts have "ample discretion in determining how best to conduct the voir dire"); United States v. Treacy, 639 F.3d 32, 47 (2d Cir. 2011) (holding that the district judge's personal policy against using a questionnaire is "well within his bailiwick as a trial judge so long as he conducts adequate voir dire by some other means").  It is also axiomatic that the use of a written questionnaire is not mandatory.  See Treacy, 639 F.3d at 46; United States v. Quinones, 511 F.3d 289, 300 n.8 (2d Cir. 2007) ("In approving the use of questionnaires as part of voir dire, we do not hold that district judges are ever obligated to make use of this procedure in selecting juries.") (emphasis added).

An appellate court will not interfere with the manner in which voir dire has been conducted absent a clear abuse of discretion.  Treacy, 639 F.3d at 46.  Restrictions on voir dire will be upheld "unless a defendant has been precluded from obtaining an impartial jury." United States v. Barnes, 604 F.2d 121, 138 (2d Cir. 1979).  The Second Circuit has noted that it has apparently never reversed a conviction because of the trial court's refusal to ask a particular question in voir dire.  See Treacy, 639 F.3d at 47.  Furthermore, even in cases where

questionnaires have been used, the Second Circuit has strongly recommended that the court conduct some oral voir dire before granting challenges for cause, unless irrevocable bias is so evident from the juror's responses on the questionnaire "as to render superfluous further oral inquiry about the juror's ability to follow legal instructions and to serve impartially." See Quinones, 511 F.3d at 302.

District courts within this circuit have routinely refused requests to use questionnaires in the jury selection process. As the court explained in Treacy:

> The[re are] many problems with questionnaires, but the single biggest problem [ ] is that there is no one in the world who can draft a question that will not have ambiguities that will be, as I learned the one time [I] tried it, that will be picked up on by various prospective jurors. And thus during the voir dire, a huge amount of time will be spent explaining to a juror why he or she misunderstood the question in the questionnaire or finding out that . . . the way he interpreted it was not the way the lawyers interpreted it.

Id. (quoting Tr. of Jan. 30, 2009 Hearing at 12-13). In Treacy, the Court of Appeals found that the district court did not abuse its discretion in declining to use a written juror questionnaire, given that he offered a rational, non-arbitrary reason for his policy, and as long as he conducted adequate voir dire by some other means. Id. at 47.

Moreover, in United States v. Tomero, 486 F. Supp. 2d 320, 324 (S.D.N.Y. 2007), the defendants requested the use of a jury questionnaire so that they could obtain more complete information about jurors in the event an anonymous jury was empaneled. There, the district court granted the government's motion for an anonymous jury, but denied the defendants' request, finding that the use of a questionnaire was unnecessary. Id. at 325. The district court noted that the government's request for an anonymous jury would "not limit

96

inquiry into the occupations of the jurors, only information about their specific places of employment." Id. Further, although the jurors' names and addresses would remain confidential, the court would inquire as to the county in which each potential juror resides. Id. The court concluded that the defense would have no problem in assessing the possible bias of potential jurors. Id. The same holds true in this case.

Here, defendants contend that a jury questionnaire is necessary because (1) the defendants are of Muslim faith from Afghanistan and prospective jurors may harbor basis that they are unlikely to admit in open court, and (2) the use of a questionnaire would make jury selection "quicker and smoother." See Def. Joint Mem. at 48. Those contentions fail.

As an initial matter, the Court, with input from counsel, can thoroughly examine the prospective jurors to ensure an unbiased jury. The defendants do not posit any legitimate, specific concerns suggesting that jurors' biases could not be elicited as easily in oral examination as in a written questionnaire.

Moreover, using questionnaires is, by no means, an efficient use of resources and will unnecessarily delay jury selection. The use of questionnaires is both time consuming and costly. The printing and copying costs for the questionnaires is an unnecessary expense. In addition to their cost, the questionnaire process will needlessly delay jury selection, as the vendor needs time to print the original blank questionnaires and an additional period of time to copy the completed questionnaires

Accordingly, a jury questionnaire is unwarranted and unnecessary.

97

**POINT VI**

**DEFENDANT SAENZ IS ENTITLED TO A HEARING
WHEREBY THE GOVERNMENT WILL ESTABLISH THAT
SAENZ'S POST-ARREST STATEMENTS WERE VOLUNTARY**

Defendant Saenz requests a hearing to determine whether his post-arrest statements were voluntary.  (Saenz Mem. at 17-18.)  The government agrees that a hearing is warranted.

At a hearing, the government expects to establish that federal agents went to an office in Florida for the purpose of locating and arresting the defendant.  Law enforcement officers observed the defendant.  They proceeded to identify themselves and asked Saenz to stand up and move away from his desk which he did.  There was no assault.  See Affidavit of Waleska DeGraves, attached here to as Affidavit 4.   Subsequently, after being read his rights, Saenz agreed to speak with the agents.  *Prior to the interview*, Saenz signed a waiver of his rights including his Miranda rights and the right to remain silent.  Affidavit 2 attaches notes, signed waiver and waiver in English.  The statements Saenz made were made voluntarily.   As for defendant's claim that he was forced to provide the password to his phone, the government has no reason to believe that is true.  In any event, the phone was equally accessible with or without a password. See Affidavit of Robert K. Turner, attached hereto as Affidavit 5.  At a hearing, the government is prepared to prove that (i) there was no assault, (ii) Saenz was given his Miranda rights before his interview and (iii) his phone was equally accessible with or without a passcode.

## <u>CONCLUSION</u>

For the above-stated reasons, defendants' requested relief should be denied.  But the Court should hold a hearing only to determine whether Saenz's post-arrest statements were voluntary.

Dated:      Central Islip, New York
              May 22, 2020

                                    Respectfully submitted,

                                    RICHARD P. DONOGHUE
                                    United States Attorney
                                    Eastern District of New York

By:      /s/_____
                                    Charles P. Kelly
                                    Catherine M. Mirabile
                                    Burton T. Ryan, Jr.
                                    Assistant U.S. Attorneys